731 S.W.2d 492 (1987)
In the Interest of B.L.G., a minor.
Leo W. ALLSTUN, Petitioner-Respondent,
v.
C.J.G.H., Appellant-Respondent, and
R.A.G., Appellant, and
Scott E. Walter, Guardian ad Litem for B.L.G., Respondent-Respondent.
Nos. 14797, 14812.
Missouri Court of Appeals, Southern District, Division Two.
May 18, 1987.
Motion for Rehearing or to Transfer Denied June 9, 1987.
Application to Transfer Denied July 14, 1987.
*493 Donald Rhodes, Bloomfield, for appellant-respondent C.J.G.H.
Rebecca McDowell Cook, Oliver, Oliver, Waltz & Cook, P.C., Cape Girardeau, for appellant R.A.G.
Kevin B. Spaeth, Richey, Price, Spaeth, Heisserer and Lewis, Cape Girardeau, for petitioner-respondent.
FLANIGAN, Judge.
On March 6, 1986, Leo W. Allstun, Jr., Juvenile Officer of the 32nd Judicial Circuit, filed, in the Juvenile Division of the Circuit Court of Bollinger County, a petition, based on § 211.444,[1] seeking to terminate the parental rights of Richard with respect to his son Brandon, age 8.
The petition alleged that the mother, legal and actual custodian of the child, was Cynthia; that the "legal father," Richard, "has consented in writing to the termination of his parental rights in the child and believes that the best interest of the child would be served if the child was available for adoption"; and that "termination of all of the parental rights of said legal father in said minor child would be in the best interest of said child."
Accompanying the petition were the following documents, each signed by Richard: Religious Preference Statement, Religious Waiver, Waiver of Necessity of Consent to and Notice of Future Adoption of Child, Consent of Parent to Termination of any and all Parental Rights. The first three of *494 these documents were dated October 12, 1985, a fact not explained in the record.
Cynthia filed an answer contesting the petition. On April 22, 1986, the trial court conducted an evidentiary hearing. Juvenile Officer Allstun appeared in person and by his attorney, Kevin Spaeth. Cynthia appeared in person and by her attorney, Donald R. Rhodes. Richard appeared in person and by his attorney, Rebecca Cook. Brandon was represented by his attorney and guardian ad litem, Scott Walter. On May 20, 1986, the trial court entered its judgment terminating the parental rights of Richard with respect to Brandon, and requiring Richard to pay attorney Rhodes a fee of $300.
Cynthia and Richard filed separate appeals from the judgment. Cynthia attacks the judgment on the ground that the evidence was insufficient to show that it was in the best interests of Brandon that Richard's parental rights be terminated. Richard attacks that portion of the judgment which requires him to pay $300 attorney's fee for Cynthia's attorney.
Brandon was born July 19, 1977, to Cynthia and a father whose identity remains undisclosed. On April 26, 1980, Cynthia married Richard. On June 11, 1982, Richard adopted Brandon. In May 1984 Cynthia and Richard separated and Brandon remained in Cynthia's custody. On January 18, 1985, Cynthia and Richard were divorced.
Although the dissolution decree was not introduced into evidence, the parties agree that at the time of the termination hearing Richard was paying $30 a week as child support for Brandon and was also furnishing him with medical insurance at a cost of approximately $25 a week. On February 19, 1985, Cynthia married her present husband, Kenneth H.
Sections 211.442 to 211.487 deal with termination of parental rights and prescribe the procedure therefor. The statutes, or their pertinent parts, which are significant on Cynthia's appeal are set forth below.[2]
Section 211.444 deals with proceedings where the parent whose rights are sought to be terminated has consented in writing to the termination. On the other hand, termination may be ordered, in proceedings under § 211.447, although the parent whose rights are being terminated has not consented to the termination and, in the usual case, has opposed it. Section 211.447 deals with termination on one or more of several grounds, including abandonment of the child, or its nonsupport, abuse or neglect or the fact that the child has been under the jurisdiction of the juvenile court for a period of one year.
The peculiar aspect of the instant proceeding is that Richard, whose parental rights are its subject, sought termination of those rights and through his attorney induced the juvenile officer to file the petition. Termination of those rights is being opposed by Cynthia.
*495 At the outset of the hearing, attorney Spaeth, representing the juvenile officer, informed the court that the proceeding was "filed under § 211.444." Spaeth further stated: "This is a unique case. I am not going to be presenting any evidence, but rather I am going to turn this proceeding over to Mrs. Cook as it is her facts (sic) that this petition is based upon, and I will let her proceed with the case. What the state is doing, and, of course, we recognize that this is a very unique position, the County of Cape Girardeau and the State of Missouri does not generally make a habit of filing a termination of parental rights action just to help one parent avoid a support obligation.... What I am in effect doing here is adopting the testimony that is going to be elicited by Mrs. Cook as testimony on behalf of the Juvenile Office." (Emphasis added.)
Near the outset of the hearing the court stated that no petition for the adoption of Brandon was presently pending.
Four witnesses testified at the hearing. They were: Cynthia, Juvenile Officer Allstun, Lillian Y. and Richard. Attorney Cook conducted the direct examination of each of those witnesses. The other attorneys and the court cross-examined Cynthia and the juvenile officer. All attorneys cross-examined Richard, and Lillian Y was cross-examined by attorney Rhodes.
Cynthia, called as an adverse witness by Mrs. Cook, testified that she was employed at a supermarket where she worked 22 to 28 hours a week at $3.35 an hour. She received $30 a week child support for Brandon from Richard, and Richard provided medical insurance for Brandon. After she and Richard separated in May 1984, Richard visited Brandon only once for a period of 45 minutes. After the separation and before the termination proceeding was filed, Brandon had called Richard a few times and asked him to come and see him or do something with him and Richard would always tell Brandon that he was too busy and did not have the time. She expressed the opinion that Brandon and Richard could develop a friendship and a father and son relationship if Richard would allow it.
On cross-examination Cynthia testified that Richard and Brandon had a father and son relationship for a period of time, that Brandon still looks upon Richard as his father and wants to see him and visit with him, and that it would be harmful to Brandon's emotional development if he never saw Richard again.
Cynthia further testified that "last week" Brandon told Cynthia he wanted to see Richard; that he saw Richard at a gymnasium and said, "Hi, Dad," and Richard told him to go home where his mother was and Brandon came home crying. "I don't believe Brandon will ever accept the fact that Richard is not going to be around and really does not want to participate in his life because Brandon questions me all the time about why his daddy doesn't want to see him, and I have no answers." Cynthia also testified that Brandon does not know that he is Richard's adopted child.
On redirect examination by Mrs. Cook, Cynthia testified that Brandon has been confused over his relationship with Richard and this has caused Brandon stress. "Brandon is going to be hurt deeply if his father refuses everything.... I believe Richard wants the court to terminate his parental rights because he does not want to have to pay child support any more or to pay out any insurance on Brandon."
Juvenile officer Allstun testified, on direct examination, that he had a brief conversation with Cynthia at the time he served the petition on her. She told him that she was not standing in the way of Richard seeing Brandon but that Richard chose not to see Brandon. She also told Allstun that she was opposing the termination because Brandon identified Richard as his father.
On cross-examination Allstun testified that he had never talked with Brandon or with Brandon's teachers or playmates. "My office was contacted by Mrs. Cook as the vehicle to bring it before the court so the court could make appropriate judgment.... Therefore, I admit, I do not have allI do not have all the facts surrounding *496 this case, and having never met the child, having never talked with the child, having never looked at any testing evaluation material, et cetera, or had someone test him for me and then staff the material, having never talked with [Cynthia] at length, having never talked with [Richard] at length, having never talked with Kenny at length, having never examined school records, et cetera, et cetera, et cetera."
Under cross-examination by his own attorney, Spaeth, Allstun testified:
"Q. Wally, this is the first time you've ever filed a termination of parental of this nature, isn't it?
A. Yes, it is. I was going to say my last. I won't say that."
On redirect examination by Mrs. Cook the following testimony was elicited:
"Q. Mr. Allstun, since you were questioned about your failure to contact any other authorities on this matter, was it not your agreement with me that I would undertake all responsibility, beyond the filing of the petition, in preparing this matter for trial and in providing what witnesses I felt was appropriate? (Emphasis added.)
A. That was the agreement."
Under examination by the court the following testimony was elicited:
"Q. Do you have any instructions that you should go out and contact the parents of the child, contact the school teacher, contact the police departments, contact the church, the preacher, the neighbors, the friends or anyone else who has been exposed to the child?
A. Yes. Chapter 211 provides that, that we should go out and make a report to the court.
Q. And in the particular matter you were leaving this up to Mrs. Cook; is this correct?
A. She said that she would pursue it."
Lillian Y, Cynthia's sister-in-law, testified on direct examination that prior to the adoption proceeding Richard told her that he really didn't want to adopt Brandon but that he was afraid he and Cynthia would not stay together unless he did so. She testified that a week or so after the adoption took place, Cynthia "was out with another man." She said that at times Richard would try to discipline Brandon and Cynthia would stop him. She also testified that Brandon did not want to see Richard, that Cynthia's present husband Kenneth would like to adopt Brandon, and that Kenneth and Brandon were "very close."
On cross-examination the witness admitted that she got upset at Cynthia because Cynthia told the witness's mother-in-law "about my being out with another man."
Richard testified, on direct examination, that his only significant contact with Brandon, after the May 1984 separation, was a 45-minute visit. Between that visit and the filing of the termination proceeding, Brandon "has never spoken to me on the street.... I had seen him at the ball diamond, for instance last summer, face-to-face, he looked at me just like I was somebody, you know, anybody else. And to be honest about it, he has not said one word to me, to my face, or come to me until this alluntil I went and started this, and that's when it started. Down at Sonny's, he'd come up to me and he start in, `Hi, Daddy,' or playing ball, on Monday nights, he would come up and, `Hi, Daddy,' you know. But this did not take place until after this had all started." (Emphasis added.)
Richard testified that he did not wish to adopt Brandon but did so "because it was either do it or pay the consequences ... putting up with pure hell or possibly a divorce." Asked what his present attitude was toward Brandon, Richard said, "When I got the divorce with Cindy, that ended it all. I felt that Brandon was a part of her life when I entered it and not a part of mine before I went into it. When I divorced her, it more or less, you know, dissolved the marriage and it was time for me to go on with my own life to raise my own family."
Under further direct examination Richard testified that he had made the child support payments only because he was under *497 a court order to do so, that he will never undertake "any greater responsibility to provide for Brandon than the courts absolutely require," that he was going to disinherit Brandon, and that his "primary motivation for checking into this [the termination proceeding] was to try to end the child support...."
On cross-examination, Richard testified that he "wanted to back out of the adoption," that he did not want to pay the child support and that he did not want to pay for Brandon's health insurance. He admitted that "Brandon has not done anything to me," that Cynthia had not prohibited him from seeing Brandon and that the dissolution decree had provisions for visitation which Richard did not utilize. Richard said, "Brandon has done nothing to destroy our relationship."
Attorney Walter, who adduced no evidence on behalf of Brandon, made the following statement to the court:
"The big fact that's gaping in my mind, that's hard for me to make a recommendation, although I will tell the court that I'm leaning towards termination of parental rights, is, I don't have anything about Brandon. I've never met the boy, I haven't had the benefit ofusually a social worker goes out and interviews, child psychologist. I think that's a serious factor here that's lacking." (Emphasis added.)
Attorney Spaeth made the following remarks during his closing statement:
"I want to defend Wally Allstun here today, I feel like he's been put on the carpet, perhaps, and I don't think he deserves it. This is a unique situation. I don't want the 32nd Judicial Juvenile Office to turn into the Acme Termination of Parents Rights Service for fathers who don't want to pay child support.... But we've got a father that's not interested, for whatever reason. And I think, clearly, the best interests of the child demand that the termination go forward. Mr. Allstun has had benefit to hear the testimony here today, and we've certainly heard from Mrs. H. herself what a fine individual Ken has been to this child and what a fine individual he is. I don't know that there's a whole lot more Mr. Allstun couldn't could have found out that we haven't already discussed here today. So I hope the court does not look bad upon him for the amount of preparation done here today." (Emphasis added.)
Among the findings made by the trial court in its judgment are the following:
"There has been no father-son relationship of any consequence between Richard and Brandon following the divorce. The mother of the child has re-married. She testified that the stepfather, Kenneth H., loves the child and that the child loves his stepfather ..., and that the child is lovingly referred to as Little [H]. Mrs. H. Testified that her present husband is a `father figure' to the child and is leaving the adoption of the child up to her. There was also testimony that `Kenny is the father right now.'
The adoptive father, Richard G., testified that after the divorce he had feelings for Brandonbut `I couldn't be a father nowhow could I when I couldn't be a father to him while I was married!' He complained that the mother of the child refused to permit him to discipline the child, claiming he was hers, not his. This claim was supported by at least one other witness.
. . . . .
The court finds that the best interest of the child would be served by severing the dead relationship between father and son and terminating the parental rights of the father."
This court must sustain the decision of the trial court unless there is no substantial evidence to support its judgment, or the judgment is against the weight of the evidence or erroneously declares or applies the law. In re Adoption of W.B.L., 681 S.W.2d 452, 454[1] (Mo. banc 1984); In Interest of B.C.H., 718 S.W.2d 158, 160[3] (Mo.App.1986). In the latter case, a termination proceeding, the court of appeals said, "The trial court is accorded deference regarding the resolution of fact issues and the credibility of witnesses.... Only when *498 a reviewing court is of the firm belief that a judgment is wrong will it reverse.... When a reviewing court is asked to review the sufficiency of the evidence, the evidence and all reasonable inferences which may be drawn from that evidence are considered in the light most favorable to the juvenile court's judgment."
By reason of the adoption of Brandon by Richard, conducted in accordance with the provisions of Chapter 453 RSMo, Brandon is "deemed and held to be for every purpose the child of ... [Richard], as fully as though born to him ... in lawful wedlock." § 453.090.1. Since no other adoption proceeding involving Brandon was pending, the instant termination proceeding, under § 211.444.1, required the filing of the petition of the juvenile officer. The power of the juvenile court to terminate Richard's rights under § 211.444 required findings "that such termination is in the best interests of the child and the parent has consented in writing to the termination of his parental rights." (Emphasis added.) The parties agree, at least tacitly, that the written consent filed by Richard met the formal requirements of § 211.444.2 and that Brandon was "at least two days old," Section 211.444.3, when it was executed. The decisive issue is whether the record supports a finding that termination of Richard's parental rights was in the best interests of Brandon.
Although the petition was filed by the juvenile officer, he conducted no investigation before filing it. The petition alleged the termination was in Brandon's best interests, but no facts were alleged in support of that allegation. The petition was filed at the request of Richard's attorney, Mrs. Cook. All four witnesses before the trial court were produced by attorney Cook pursuant to an agreement between her and the juvenile officer that she would "undertake all responsibility, beyond the filing of the petition, in preparing this matter for trial and in providing what witnesses [attorney Cook] felt was appropriate."
Attorney Cook presented all of the direct testimony in the trial court, but in this court, peculiarly enough, the only brief opposing Cynthia's appeal was filed by attorney Spaeth on behalf of the juvenile officer.
Cynthia's testimony, in general, does not support a finding that termination was in the best interests of Brandon. Although Richard's contacts with Brandon since the May 1984 separation have been infrequent, Cynthia said that Brandon desired to continue his relationship with his father and that it was Richard who wanted that relationship to end. Richard was primarily interested in seeking relief from the financial burdens imposed on him by his parenthood and delineated in the provisions of the dissolution decree.
Juvenile officer Allstun conducted no investigation of Brandon's circumstances, including his relationship with Richard, and his testimony lends no support to the termination order.
The testimony of Lillian Y., as well as portions of Richard's own testimony, appear to constitute an attempt to attack, collaterally, the 1982 adoption decree on the theory that Richard consented to the adoption through duress. In addition to the testimony previously given, Richard testified that, in the adoption proceeding, he was represented by competent counsel and was well aware of the effects of adoption.
The Minnesota Supreme Court has held that in a termination proceeding, initiated by the adoptive father, "motivations and circumstances attendant upon the original adoption proceeding ... have no relationship to the policies underlying the [termination statute]." In re Welfare of Alle, 304 Minn. 574, 230 N.W.2d 574, 576[3] (1975).
Although "the broad equitable powers vested in our courts of general jurisdiction (and which are also vested with jurisdiction of the laws of this state relating to adoption) empower them to vacate a decree of adoption upon any of the classical grounds that entitle such courts to vacate any other decree, such as judgments procured by fraud ...," In re McDuffee, 352 S.W.2d 23, 27 (Mo. banc 1961), quoted with approval in In re Novak, 536 S.W.2d 33, 37 (Mo. banc 1976), Richard did not, in this proceeding, *499 directly attack the validity of the 1982 adoption decree.[3] Indeed the very nature of this proceeding, instigated by Richard, postulated that the adoption decree was valid because it was that decree which created the parental rights which the instant proceeding sought to terminate.
Testimony seeking to cast doubt upon the validity of the 1982 adoption decree had no proper place in this proceeding. Those portions of the respective testimonies of Lillian Y. and Richard which seek to do so lend no support to the instant judgment and, on proper objection, should have been excluded.
Lillian's testimony that Brandon did not want to see Richard, even if believed, is not sufficient to uphold the judgment. If such an attitude existed, the record makes it clear that it was induced by Richard's inattention and Richard should not benefit by his own shortcomings.
Section 211.462.3 imposes upon the guardian ad litem certain duties as the child's legal representative and his "advocate." Section 211.462.3(2) requires the guardian ad litem, in order to ascertain "the child's wishes, feelings, attachments, and attitude" to "conduct all necessary interviews with persons, other than the parent, having contact with or knowledge of the child and, if appropriate, with the child." That duty was not performed here.
Although § 211.444 requires, in the circumstances here, that the parent, whose parental rights are to be terminated, consent in writing to the termination, it does not permit that parent to file the petition. Consent alone is not sufficient. The petition must be filed by the juvenile officer and the evidence must support a finding that termination is in the best interests of the child.
Although § 211.455.3 excepts, from its requirement of an investigation and social study, cases filed under § 211.444, the juvenile officer who files the petition must act in a role beyond that of a mere tool of a parent whose primary motivation is that of avoiding parental responsibilities. The filing of the petition should be the product of sound discretion based on a reasonable amount of prior investigation. It has long been held that "whoever seeks to invoke the [termination] statute must carry the full burden of proof." In re Interest of W.F.J., 648 S.W.2d 210, 214[6] (Mo.App. 1983); D.J.A. v. Smith, 477 S.W.2d 718, 720[2] (Mo.App.1972). Section 211.444 was enacted in 1985, but the part on which the instant proceeding was based was contained in § 211.447 prior to the amendment of that statute in 1985. That part was also found in § 211.441.1(1) RSMo 1959, although that statute required the written consent of the parents.
Richard's testimony, as well as the entire record, demonstrates that this proceeding was initiated and orchestrated by him, through his counsel, for the paramount purpose of relieving him of the financial obligations imposed upon him by the dissolution decree. It need not be decided whether an affirmance of the instant judgment would have the effect desired by Richard. Relieving Richard of those obligations is not in the best interests of Brandon. Although Brandon's stepfather has certain duties of support so long as he and Brandon are living in the same home, § 453.400, that statute provides that it does not diminish "the duty a parent otherwise would have to provide child support."
Before termination may be ordered under § 211.444 there must be a finding, supported by competent evidence, that termination is in the best interest of the child. The statute deals with termination of the rights of a parent. This record shows an attempt by the parent to terminate, solely for his own interest, his parental duties. This court holds that the record is insufficient to support a finding that termination is in the best interests of Brandon. Cynthia's appeal is meritorious.
Richard's appeal attacks that portion of the judgment which requires him to pay $300 attorney's fee for Cynthia's attorney. This appeal, too, is meritorious.
In State ex rel. Cain v. Mitchell, 543 S.W.2d 785 (Mo. banc 1976), the court said, at 786:

*500 "The right to recover attorneys' fees from one's opponent in litigation as a part of the costs thereof ... [did] not exist at common law.... [W]hether attorneys' fees are recoverable depends upon either express statutory authority or agreement of the parties.... [T]he term `costs' as used in a statute does not include attorneys' fees, with certain exceptions.... For a list of the exceptions to this rule see Johnson v. United Rys. Co., 247 Mo. 326, 152 S.W. 362, 366 (banc 1912)." None of the Johnson exceptions applies here. In Cain the court dealt with § 211.281 which reads:
"The costs of the proceedings in any case in the juvenile court may, in the discretion of the court be adjudged against the parents of the child involved or the informing witness as provided in section 211.081, as the case may be, and collected as provided by law. All costs not so collected shall be paid by the county."
The court held that attorneys' fees are not included in the term "costs" as used in § 211.281. Accordingly that statute does not support the order requiring Richard to pay the $300 fee of Cynthia's attorney.
Section 211.462 reads, in pertinent part:
"1. In all actions to terminate parental rights, if not previously appointed pursuant to section 210.160, RSMo., a guardian ad litem shall be appointed for the child as soon as practicable after the filing of the petition.
2. The parent or guardian of the person of the child shall be notified of the right to have counsel, and if they request counsel and are financially unable to employ counsel, counsel shall be appointed by the court. Notice of this provision shall be contained in the summons....
3. . . .
4. Court costs shall be paid by the county in which the proceeding is instituted, except that the court may require the agency or person having or receiving legal or actual custody to pay the costs." (Emphasis added.)
The term "the costs," as used in § 211.462, has been held, in a two-to-one decision, to include attorneys' fees. L.R.R. v. Christian Family Services, Inc., 620 S.W.2d 14 (Mo.App.1981). The majority felt that there was significance in the use of the term "court costs" at the start of the sentence which comprises § 211.462.4, as contrasted with the use of the term "the costs" at the end of that sentence. Importance was attached to the absence of the adjective "court." Judge Snyder, the dissenter, felt that the holding in Cain dictated a contrary conclusion.
In the wake of L.R.R., other opinions of the court of appeals have agreed with its holding. A.M.G. v. Mo. Div. of Family Services, 660 S.W.2d 370 (Mo.App.1983); In Interest of D.L.D., 701 S.W.2d 152 (Mo. App.1985); K.S. v. Division of Family Services, 722 S.W.2d 364 (Mo.App.1987). In dictum the Supreme Court of Missouri has agreed. In Interest of K.P.B., 642 S.W.2d 643 (Mo. banc 1982).
Nevertheless, § 211.462.4 does not support the instant award of attorneys' fees. It is questionable whether Cynthia made a showing that she was "financially unable to employ counsel," § 211.462.2. Mr. Rhodes was not appointed by the court as that section contemplates. Moreover, even if those factors were present, and if Cynthia had requested counsel, see In Interest of B.M.P., 704 S.W.2d 237 (Mo.App. 1986), the situation is not within the exception contained in § 211.462.4. The latter statute requires that the "court costs" shall be paid by the county in which the proceeding is instituted, except that the court may require payment of "the costs" by "the agency or person having or receiving legal or actual custody." Richard is not an agency, nor is he a "person having or receiving legal or actual custody." The order requiring him to pay the $300 attorney fee was invalid.
The judgment is reversed.
PREWITT, P.J., and MAUS, J., concur.
NOTES
[1] Unless otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S.
[2] Section 211.444. 1. The juvenile court may, upon petition of the juvenile officer, or the court before which a petition for adoption has been filed under the provisions of chapter 453, RSMo, may terminate the rights of a parent to a child if it finds that such termination is in the best interests of the child and the parent has consented in writing to the termination of his parental rights.

. . . . .
Section 211.455. 1. Within thirty days after the filing of the petition, the juvenile officer shall meet with the court in order to determine that all parties have been served with summons and to request that the court order the investigation and social study.
2. . . .
3. The court shall order an investigation and social study except in cases filed under section 211.444....
Section 211.459. 1. Within thirty days after the juvenile officer and the court have met pursuant to section 211.455, the court shall hold the dispositional hearing ...
Section 211.462. In all actions to terminate parental rights, if not previously appointed pursuant to section 210.160, RSMo, a guardian ad litem shall be appointed for the child as soon as practicable after the filing of the petition.
. . . . .
Section 211.477. 1. If, after the dispositional hearing, the court finds that one or more of the grounds set out in section 211.447 exists or that the parent has consented to the termination pursuant to section 211.444 and that it is in the best interests of the child, the court may terminate the rights of the parent in and to the child....
[3] See 2 A.L.R.2d 887 Annulment or Vacation of Adoption Decree by Adopting Parent or Natural Parent Consenting to Adoption. See also 2 Am. Jur.2d Adoption, § 79, p. 925. Cf. § 453.140.