**In the Interest of W.D.T., M.E.T., L.W.T., and S.L.T., minors under 17 years of age.**

**Perry W. EPPERLY, Chief Juvenile Officer, Petitioner–Respondent,**

v.

**W.D.T., Respondent,**

and

**R.E.B., Respondent–Appellant.**

**No. 16231.**

Missouri Court of Appeals, Southern District, Division Two.

Feb. 20, 1990.

Motion for Rehearing or to Transfer Denied March 13, 1990.

Cheryl A. Capages, Springfield, for respondent-appellant.

Scott B. Tinsley, Springfield, for petitioner-respondent.

FLANIGAN, Presiding Judge.

Pursuant to §§ 211.442 through 211.487,[1] the chief juvenile officer of Greene County instituted this proceeding to terminate the parental rights of Robin E.B., the natural mother, and W.D.T., the natural father, to their four children, William (born November 1, 1980), Misty (born January 9, 1982), Lesley (born August 6, 1983), and Shawn (born May 7, 1985).

Robin married the natural father in May of 1979, and they were divorced in July

---

**1.** All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

1986. In November 1986, Robin married another man and they were divorced in February 1987.

A guardian ad litem was appointed for the children. The father, although duly served with process, failed to appear. A hearing was held at which evidence was introduced by the juvenile officer and by Robin. On January 23, 1989, the trial court entered its order terminating the parental rights of Robin and the father. The order placed the children in the custody of the Division of Family Services, with authority to place them in prospective adoptive homes. Robin appeals.

Robin's sole point is that the trial court erred in entering the order terminating her parental rights because "the evidence presented by [the juvenile officer] was insufficient and was not clear, cogent, and convincing, and the court gave undue consideration to the best interests of the children." Specifically, Robin contends that the evidence presented by the juvenile officer failed to show that Robin refused to attend or participate in the social services plans or that she refused to cooperate with the juvenile authorities in adjusting her circumstances or conduct to provide a proper home for the children. She contends that the evidence showed only that she was unable, by reason of an untreated personality disorder, to comply with the treatment programs.

This court must sustain the decision of the trial court unless there is no substantial evidence to support its judgment, or the judgment is against the weight of the evidence or erroneously declares or applies the law. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454[1] (Mo. banc 1984); *In Interest of B.L.G.*, 731 S.W.2d 492, 497[1] (Mo.App.1987). The trial court is accorded deference regarding the resolution of fact issues and the credibility of witnesses. This court will reverse the judgment only when it is of the firm belief that the judgment is wrong. *In Interest of B.C.H.*, 718 S.W.2d 158, 160[3] (Mo.App.1986). In reviewing the sufficiency of the evidence, this court considers the evidence, and all reasonable inferences which may be drawn

therefrom, in the light most favorable to the trial court's judgment. *Id.*

Section 211.447.2 sets forth three grounds for termination of parental rights by the juvenile court acting upon a petition filed by the juvenile officer. Termination may be ordered if the court "finds that the termination is in the best interests of the child" and "when it appears by clear, cogent, and convincing evidence" that one or more of the grounds existed. The ground on which the instant petition and order were based is set forth in § 211.447.2(3), which reads:

"(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently pro-

viding the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control."

In *In re H.K.*, 762 S.W.2d 465, 469[3] (Mo.App.1988), the Western District of this court said:

"Subparagraphs (a) through (d) of Section 211.447.2(3) are merely factors to be considered under the ground for termination provided in that subdivision, i.e., Section 211.447.2(3). These factors are not separate grounds for termination in and of themselves but rather categories of evidence to be considered together with all other relevant evidence."

The petition to terminate parental rights was filed September 14, 1988, and the order of termination was entered on January 23, 1989. The Division of Family Services had been in contact with Robin and her children since July 1, 1982.

On December 11, 1986, upon the petition of the juvenile officer and after an evidentiary hearing, the court entered an order taking jurisdiction of the four children under § 211.031.1(1). In that order the court found, among other things, that Robin "has left said juveniles with various individuals for a week at a time without informing anyone of her whereabouts, thereby making it impossible for said juveniles to receive any needed medical attention, and further [Robin] neglected to obtain the appropriate medical attention for [the second child] who was congested and suffering from infantigo (sic) and head lice." The court found that Robin was "unable to provide a proper environment for all of said juveniles as demonstrated by [Robin's] lack of a stable or permanent place of residence for said juveniles"; that Robin "has left said juveniles with various individuals for a period of time and her whereabouts were unknown to caretakers"; and that Robin "is unable to provide proper care for said children."

The Division of Family Services had frequent contacts with Robin and her children commencing in July 1982 and continuing to the entry of the protective custody order in August 1986. Most of that time the children were with Robin and they led a nomadic existence. The juvenile officer introduced evidence that during those years there were "substantiated reports of neglect," reports of medical neglect, reason to suspect threatened sexual harm to the children, and physical abuse of the children by their father. There were "hot line reports" received by the Division with respect to neglect of the children. On one occasion the third child, then 2½, "had wandered from the home when left unsupervised." The child was "very dirty and wearing only soiled and torn underwear.... The child was covered with urine and feces. From his appearance it was assumed he had been out a considerable period of time."

Written service agreements, attempted by the Division with Robin, were unsuccessful. In May 1985, Denise Thornhill, a social worker for the Division, wrote a service agreement for Robin, who was then separated from the father. Mrs. Thornhill testified she had worked with Robin six to nine months before writing the service agreement. One problem was that Robin moved around quite a bit and stayed with various friends and relatives. She stayed in homes where there were "a lot of people." "It was chaotic and lacked stability and adequate housing that the children needed." Mrs. Thornhill testified that Robin did not abide by the service agreement and there continued to be "lack of supervision, children found wandering in the street, children inadequately clothed and bathed."

After August 1986, when the children were taken into protective custody, the court ordered "the first treatment plan," which placed certain requirements on Robin which she failed to meet. Robin provided snacks for the children which, according to their medical diet, they were not supposed to have. Robin took the children outside when she had been told to keep them inside because of illness. Robin failed to comply with a condition of the plan requiring that she undergo counseling. She offered "various excuses" for her non-

compliance. Robin did not comply with a condition which required her to keep in touch with Mrs. Thornhill and report on her employment situation and on the children.

Over many months the Division of Family Services attempted to obtain for Robin aid and treatment from experts in various fields. In October 1986, the Division made arrangements for Robin to see Deborah Kukal, a psychologist. Robin saw Mrs. Kukal only once and failed to keep follow-up appointments which had been scheduled. In December 1986, after the children had been placed in foster care, Robin saw Pamela Hunt, a therapist specializing in sexual abuse. The purpose of the visit was to help Robin develop parenting skills. Robin failed to keep follow-up appointments with Mrs. Hunt. In January 1987, Robin had four scheduled appointments with Donna Greencuts, a therapist, but cancelled three of them. In February 1987, Robin was seen by Dr. Leach, a psychiatrist who treated her for depression symptoms. Robin failed to keep subsequent appointments with Dr. Leach and did not take medication he prescribed. In March 1987, Robin was seen by Joyce Wise, a child development specialist and therapist. Mrs. Wise testified that she had three meetings with Robin and "three no-shows." Mrs. Wise felt that Robin was making a very minimal effort to meet her goal of "getting her children back." In August 1987, Robin was seen by Joyce Tinsley, a psychologist. According to Mrs. Tinsley, "I had five visits with Robin, four cancellations, and four no-shows." Mrs. Tinsley referred Robin for three psychological evaluations but Robin failed to keep those appointments. Mrs. Tinsley scheduled them again and Robin "didn't show up again." Mrs. Tinsley testified that Robin's behavior "was not consistent with wanting the kids back."

In January 1988, Robin was interviewed by Robert Murney, a clinical psychologist. Dr. Murney gave Robin "a battery of psychological tests." He testified that Robin showed no evidence of being psychotic and did not manifest a serious psychiatric disturbance. He testified that Robin "showed a borderline personality disorder," which is one of the more severe personality disorders. He said that Robin was not retarded and had "at least dull normal to low average intelligence." He said that parenting, for Robin, was "unusually stressful" and that she needed counseling and therapy. Dr. Murney questioned Robin about why she had not kept her appointments with the therapists and said, "She gave me many different excuses." Dr. Murney said the excuses, in his opinion, "would not hold up over time to account for why she had never followed through."

On cross-examination by Robin's counsel, Dr. Murney said, "I cannot make a sharp distinction between whether Robin refused to participate in the program or whether she was not able to do so because of her personality problems. I think probably both."

Dr. Murney testified that Robin "would be most difficult" in responding to therapy. He said that he "would have serious questions about whether she would follow through continuously." He also said, "There are no local patient facilities that would be able to help her with this problem because most of them are based on short-term acute care." He testified that if Robin had had treatment at an in-patient facility, "Menninger's or some place like that," "perhaps she would have made a little bit more progress by now." He added, however, "I cannot say that if she had had treatment two years ago she would have been able to [adjust] because I cannot say she would have stayed in treatment. I am struck by the fact of the lack of any kind of stability in her living."

The division, under court supervision, entered into various "service agreements" and "treatment plans" with Robin for the purpose of improving her ability to give the children proper care. A service agreement was entered into on May 15, 1986. Home visits were attempted by a social worker on June 18 and June 20, but no one was home although the visits had been agreed upon in advance. On June 23, the worker found one of the children, dressed only in dirty underwear, banging on the front door with no response. Robin was in the living room playing a game. On July 14, 1986, Robin

and the children moved without notifying the division of a forwarding address.

On December 11, 1986, the court ordered that temporary legal custody of the children be placed with the division, and the court ordered a treatment plan. During the six-month period this plan was in effect, Robin moved five times. When the children visited Robin, she permitted them to play outdoors in defiance of specific instructions to keep them inside due to illness. It was during this period that Robin failed to keep scheduled appointments with Deborah Kukal, Pamela Hunt, and Joyce Wise. The social worker reported that there were "questions concerning Robin's truthfulness in reporting household members."

On August 4, 1987, the court ordered another treatment plan. Robin failed to establish adequate housing for the children. Robin moved eight times during a six-month period. Robin's home was cluttered and untidy, and the yard and front porch were strewn with debris and hazardous materials. Parent training was offered to Robin but she was not interested in participating in the program. She missed appointments with Dr. Joyce Tinsley and failed to participate consistently in individual therapy. Robin continued to provide inappropriate snacks for the children during visits and ignored one child's need for a special diet. Although the treatment plan required Robin to keep the division advised of her place of residence, Robin moved often without notifying the division.

In its order of January 23, 1989, the court found, among other things, that Robin failed to comply with the terms of the treatment plans of December 1986 and August 1987; that Robin had failed to participate faithfully in parenting classes to reinforce her parenting skills; that Robin had failed "to faithfully participate in therapy and counseling in that she has refused to cooperate with her counselors and attend her scheduled appointments"; that Robin "has not cooperated with the Division of Family Services in that she has failed to keep them notified of her residence and has refused to comply with the requests and suggestions of her case worker"; that Robin "was in serious need of counseling and therapy in order to improve her parenting skills and chose not to take advantage of the counseling offered her by the Division"; that Robin made only token efforts to comply with the treatment plans; that the Division worked with Robin "for more than three years in attempting to improve her parenting skills and all efforts have failed due in great part to Robin's failure to cooperate"; that "the continuation of a parent-child relationship between Robin and [the natural father] with the children greatly diminished the children's prospects for early integration into a stable and permanent home"; that "the instability in the life of Robin and her inability to provide adequate parental supervision for the minor children is potentially harmful to said children should they be returned to that environment."

The termination order also recited that "It appears by clear, cogent and convincing evidence that statutory grounds for termination of [Robin's and the natural father's] parental rights over and to their minor children exist in that (a) the minor children have been under the jurisdiction of the juvenile court for a period of over one year as required by § 211.447.2(3); (b) conditions of a potentially harmful nature continue to exist; (c) there is little likelihood that those conditions will be remedied at an early date so that the children can be returned to their biological parents in the near future; and (d) the continuation of the parent-child relationships greatly diminish the children's prospects for early integration into a stable and permanent home."

This court holds that the foregoing findings are fully supported by the record and that the order of termination was properly entered.

Robin argues that the evidence showed only that she, "because of an untreated personality disorder, was unable to comply with the treatment programs and the evidence showed that the two treatment programs did not address [her particular problems]." She also argues that her inability to "adjust her situation" was not her fault

"but rather was because of the ineffective assistance of the social worker as well as the psychologist who improperly diagnosed her problem."

The excellent brief of the juvenile officer, as respondent, contains this statement: "[Robin] complains that the Division of Family Services failed to provide her with necessary psychotherapy to help her deal with her personality disorder and medication to deal with depression in order to properly equip her with the necessary skills for parenting. This position is ludicrous in light of the evidence that the Division of Family Services spent approximately three years in providing [Robin] with numerous psychiatrists, psychologists and family therapists, all of whom were available at no cost to [Robin], for the purpose of engaging in intensive therapy to deal with [Robin's] problems.... The Division cannot be expected, nor is it legally authorized, to physically force a parent to obtain necessary help." This court agrees.

The judgment is affirmed.

HOGAN, C.J., and MAUS, J., concur.