**In the Interest of C.K.G., a child under seventeen years of age.**

**M.F.H., Appellant,**

**v.**

**Perry W. EPPERLY, Chief Juvenile Officer of Greene County, Respondent.**

**No. 17687.**

Missouri Court of Appeals, Southern District, Division One.

April 7, 1992.

Douglas W. Greene, III, Twibell, Upp & Greene, Springfield, for appellant.

Kay A. Van Pelt, F. Richard Van Pelt, Van Pelt and Van Pelt, P.C., Springfield, for respondent.

CROW, Judge.

On October 24, 1990, the Chief Juvenile Officer of Greene County filed a petition to terminate the parental rights of M.F.G.[1] ("Mother") and her former husband, S.D.G. ("Father"), to their son, C.K.G. ("C"), born February 27, 1981. The trial court heard evidence on two dates, and on June 18, 1991, entered an order terminating the parental rights of both parents.

Mother, alone, appeals. The first of her two points relied on avers the trial court erred in four respects: (A) failing to properly consider "the statutory elements" of § 211.447, RSMo 1986; (B) failing to consider "the unrebutted evidence that [Mother] had complied with all of the requirements of § 211.447 and had successfully complied with all requirements of all court ordered treatment plans"; (C) failing to

"consider, construe, and strictly adhere to the ... statutory elements contained in § 211.447 which are mandatory for the trial court to consider prior to ordering the termination of parental rights"; and (D) making findings of fact "against the weight of the evidence and unsupported by substantial evidence."

The authority to terminate parental rights is conferred by § 211.447, RSMo Cum.Supp.1990. Subsection 2 thereof reads:

> The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer ... if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:
>
> ....
>
> (2) The child has been adjudicated to have been abused or neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
>
> (a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
>
> (b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
>
> (c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent ... or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

---

1. M.F.G. married L.H. after the petition was filed, and was carrying his surname at time of appeal. Consequently, she is identified as M.F.H. in the title of the case.

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental, or emotional health and development.

. . . .

In its order terminating parental rights, the trial court found C had been adjudicated abused or neglected in a jurisdictional hearing December 14, 1988, in the Juvenile Division of the Circuit Court of Greene County in case JU188–325J. The trial court made the following findings as required by paragraphs (a) through (d) of subdivision (2) of subsection 2 of § 211.447 (quoted above):

a. ... There was no clear, convincing and cogent evidence presented that would substantiate a finding that said biological mother ... suffer[s] from any such mental condition. However, there was evidence presented that said biological mother is unable to place the best interest of her child above her own personal need. That said biological mother has a personality disorder in which she places the need of her boy friends above all else. That this is a long term problem and continues to pose a danger to said minor child.

b. ... There was evidence presented which would indicate that said biological mother suffers from an alcohol and substance abuse condition. That by mother's own admissions and supporting evidence mother has a long history of abusing alcohol and cocaine. That this condition is presently being treated but continues to be a source of vital concern to said biological mother and her counselor.

c. ... There was evidence presented which would establish said biological mother should have known [severe or recurrent] acts [of physical, emotional or sexual abuse] had been or were being committed toward said minor child. That by said biological mother's own testimony and other supporting evidence it was established said biological mother knew or should have known that such acts of emotional and sexual abuse were occurring toward said minor child. That these acts were perpetrated by Michael B____, Danny L____, Donny K____ and other paramours of said biological mother. That said acts consisted of, but were not limited to, sodomy and oral sex.

That said biological mother knew or should have known that acts of physical abuse were committed toward Michelle L____ [a daughter of Mother] by Michael B____ which resulted in the death of said child. That Michelle L____ was a sibling of [C] and a member of his family as required under section 211.447.2(2)c as amended to date. That said acts consisted of, but were not limited to, beating her about the head, chest and legs, and sodomy. That evidence establish this knowledge is the ... source of great guilt in said biological mother's life.

d. That said biological mother ... [has] repeatedly or continuously failed to provide the said minor child with adequate food, clothing, shelter, or education as defined by law or other care, custody, and control necessary for his physical, mental, or emotional health and development, although physically or financially able.

Before addressing Mother's first point, a synopsis of the evidence is helpful.

Mother was born September 4, 1962. She married Father in 1979. C was born February 27, 1981. The marriage was dissolved in 1982.

Mother thereafter commenced a relationship with one Ralph. She and C lived with Ralph some six months, after which Ralph departed.

Mother moved in with Danny L____ in June, 1983. Michelle L____, mentioned in finding "c" (quoted above), was born August 1, 1986. Danny L____ left Mother in January, 1987.

Michael B____ moved in with Mother in the summer of 1988. On October 16, 1988, an investigator for the Division of Family Services ("DFS") went to the residence of Mother and Michael B____ in response to a reported "abuse and neglect situation."

Some four weeks earlier, police had received a complaint that Michelle had bruises on her face and "some vaginal redness." Questioned by the investigator, Mother disclosed no "domestic violence." The investigator found no evidence indicating C or Michelle was at risk.

On Thursday, October 20, 1988, Mother was called home from work by Michael B____. Mother saw Michelle had bruises across her forehead and on her chin, down her back and on her buttocks. Mother also noticed blood "from the front to the back of the child's bottom." Michael B____ informed Mother that Michelle had been constipated for a couple of days and had passed a large stool, accounting for the bleeding.

In the ensuing days, Michelle wanted to sleep a lot, had diarrhea, and was throwing up. She would not eat.

On Tuesday, October 25, 1988, Mother arrived home from work and found Michelle in worse condition. Michelle's lips appeared swollen and bruised. She was unresponsive. When Mother asked Michael B____ what had occurred, he became angry and departed. Mother, accompanied by C, took Michelle to a hospital.

Michelle arrived at the hospital about 11:00 p.m., in a comatose state. Examination indicated she was suffering from intracranial bleeding resulting from a blow to the head. A physician concluded Michelle had sustained head trauma and "rectal trauma" within hours before arriving at the hospital. A DFS investigator observed countless bruises on Michelle's head, body and limbs. Some appeared more recent than others.

Because of the severity of Michelle's injuries, a DFS official took protective custody of C at the hospital on the morning of October 26.

A DFS worker talked with Mother that date (October 26) and asked why she had waited five days (from October 20 until October 25) to take Michelle to the hospital. Mother replied she feared there would be a report "to the hotline," as there had been a report a few days earlier.

Michelle never recovered, and died in the hospital October 28, 1988. Michael B____ ultimately pled guilty to second degree murder in connection with Michelle's death and was sentenced to life imprisonment.

Soon after C was taken into protective custody, a petition was filed in his interest in the Juvenile Division of the Circuit Court of Greene County, evidently per § 211.031.-1(1), RSMo 1986. We infer that proceeding was case JU188–325J, referred to in the trial court's findings in the instant case.[2] A hearing on the issues of jurisdiction and disposition was held December 14, 1988, in JU188–325J. The court ordered C continued in the temporary legal custody of DFS. That order was obviously the one mentioned in the order terminating parental rights, noted earlier in this opinion. Additionally, the court in JU188–325J approved a treatment plan for Mother and ordered it implemented.

The services provided for C in JU188–325J included psychological evaluation and counseling. During those sessions, C gradually disclosed a long and appalling history of physical and sexual abuse at the hands of Mother's adult male companions.

The first male to inflict physical abuse on C was Danny L____ who, it will be recalled, began cohabiting with Mother in June, 1983, when C was two years and four months old. Danny would pick C up, hurl him against walls, and be "very physical." According to a counselor, Mother saw "some of the physical abuse to [C] by Danny."

C revealed Danny also subjected him to sexual abuse, including oral sodomy performed by each on the other. C stated that once when Danny was molesting him, Mother came home early from work and "she had seen it."

Michael B____, who moved in with Mother in 1988, also inflicted physical and sexual abuse on C. The physical abuse included

---

**2.** On the first day of trial in the instant case, the trial court took "judicial notice" of case JU188–325J, characterized in the transcript as "the underlying neglect case." Mother has failed to include the file in JU188–325J in the record on appeal.

spankings with a large leather belt. C recalled Michael inflicting similar spankings on Michelle and "backhanding" her in the face and "setting her down in broken glass one time when she didn't have her shoes on." The sexual abuse suffered by C at the hands of Michael included oral sodomy performed by each on the other and anal sodomy performed on C by Michael.

C also described sexual abuse by two other adult males, one of whom was his uncle.

The services provided for Mother included a "drug rehabilitation" program at a Springfield hospital. This began in January, 1989. Mother became pregnant while enrolled in the program, and after 28 days was sent to Lafayette House in Joplin "for further treatment." According to Mother, Lafayette House is "a woman's facility and there is not men around."

Mother was at Lafayette House 60 days, after which she moved to a nearby house and continued drug rehabilitation.

Mother's pregnancy during the drug rehabilitation program produced a daughter, Nicole, born November 5, 1989.

On December 15, 1990, Mother married L.H.[3] According to Mother, he is not Nicole's father.

At time of trial,[4] Nicole was in "DFS custody in Joplin." C was still in DFS custody per case JU188–325J and was living in a children's residential facility, where he had been since May 9, 1989.

The theory of parts "A" and "B" of Mother's first point (set forth earlier), as we understand it, is that the trial court's findings on the subjects spelled out in paragraphs (a) through (d) of subdivision (2) of subsection 2 of § 211.447 (quoted earlier) are not unanimously adverse to her, hence the trial court wrongly terminated her parental rights.

■ As to paragraph (a) of § 211.447.-2(2), Mother points out the trial court found no clear, cogent or convincing evidence that she suffered from an irreversible mental condition rendering her unable to provide C the necessary care, custody and control. However, as we have seen, the trial court found Mother had a "personality disorder" in that she placed the needs of her boyfriends above those of her children, and this posed a danger to C.

In that regard, a DFS caseworker testified Mother admitted she had been aware Michael B____ "had been violent towards the children."

A clinical psychologist testified Mother "knew something was wrong" regarding the way Michael B____ was treating C and Michelle, yet she continued to leave them with him while she was at work.

C told a DFS caseworker he informed Mother he and Michelle were being hurt by Michael B____ and showed her the bruises.

At trial, Mother admitted that upon discovering Michelle's injuries on October 20, 1988, she (Mother) continued to leave Michelle and C with Michael B____ because she (Mother) was afraid that if she took them to a baby-sitter, someone would turn her in and "they would find out that I was using drugs."

As to paragraph (b) of § 211.447.2(2), Mother concedes there was evidence to support a finding that she "at one time was chemically dependent." However, argues Mother, there was no evidence that such condition could not be treated.

On this issue, a clinical psychologist testified one reason Mother failed to protect C and Michelle from mistreatment by Michael B____ was "drug and alcohol abuse" which "clouded her judgment." Another factor was Mother's "extreme dependence on males that forced her to consider them first before anything else." The psychologist concluded Mother "still has difficulty with relationships."

As to paragraph (c) of § 211.447.2(2), Mother concedes Michelle was murdered by Michael B____ while she (Mother), Michelle and C were living with Michael. Mother also acknowledges C "lived a tortured life

---

**3.** Footnote 1, *supra.*

**4.** Trial occurred April 4 and May 23, 1991.

and underwent repeated incidents of sexual and physical abuse" committed by Mother's cohabitants. However, Mother attempts to excuse her failure to intercede by stating the evidence did not demonstrate she could have known of the mistreatment. According to Mother, it is inferable she failed to realize the severity of the situation "due to her drug and alcohol haze."

The trial court evidently found that excuse unpersuasive. The evidence, as we have seen, was that Mother held a job during the period when Michael B____ was abusing C and Michelle. Obviously, Mother was not in a stupor all the time. Furthermore, she admitted she feared that if a baby-sitter saw C and Michelle, she (Mother) would be reported to DFS. We reject Mother's contention that the evidence failed to support the trial court's finding that she knew or should have known of the abuse to C and Michelle.

As to paragraph (d) of § 211.447.2(2), the evidence was sufficient to support a finding that the care C received in Mother's custody was inadequate by reason of the physical and sexual abuse described earlier.

As explained by *In the Interest of L.G.*, 764 S.W.2d 89, 94 (Mo. banc 1989), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3196, 105 L.Ed.2d 704 (1989), § 211.447.2(2) authorizes termination of parental rights if it is in the best interests of the child and it appears by clear, cogent and convincing evidence that the child has been adjudicated to have been abused or neglected. In deciding whether to terminate parental rights on that ground, the court must consider and make findings on the conditions or acts of the parent spelled out in paragraphs (a) through (d) of § 211.447.2(2). 764 S.W.2d at 94. Each of those conditions or acts constitutes circumstances having a negative impact on the child and would, if found to exist, support termination. Absence of any such circumstances would militate against termination, but would not preclude it. *Id.* Said another way, the circumstances itemized in paragraphs (a) through (d) of § 211.447.2(2) are merely factors to be considered in deciding whether to terminate parental rights when a child

has been adjudicated to have been abused or neglected. *Cf. In re H.K.*, 762 S.W.2d 465, 469[3] (Mo.App.1988). These factors are not separate grounds for termination in and of themselves, but rather categories of evidence to be considered together with all other relevant evidence. *Id.*

Mother acknowledges C was adjudicated abused or neglected in JU188–325J. As reported earlier, the trial court so found in its order terminating parental rights. The trial court further found termination was in the best interests of C.

An order terminating parental rights will be affirmed on appeal unless it is unsupported by substantial evidence, against the weight of the evidence, or erroneously declares or applies the law. *In the Interest of W.D.T.*, 785 S.W.2d 286, 287 (Mo.App.1990); *In the Interest of B.L.G.*, 731 S.W.2d 492, 497[1] (Mo.App.1987); *In the Interest of B.C.H.*, 718 S.W.2d 158, 160[3] (Mo.App.1986). The clear, cogent and convincing standard of proof is met when the evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454[4] (Mo. banc 1984). This standard of proof may be met although the court has contrary evidence before it. *Id.* at 454[5]. As the trier of fact, the trial court has leave to believe or disbelieve all, part or none of the testimony of any witness. *Id.* at 455[10].

In the instant case a DFS caseworker who was assigned the case from November, 1988, until November, 1989, concluded Mother's parental rights should be terminated because there appeared to be no viable way for C to be reunited with her. The caseworker explained that if parental rights were not terminated, C would never have a chance for a permanent home. That was graphically illustrated by C's continued presence in the children's residential facility 31 months after he was taken into protective custody.

A counselor who had regularly seen C for two years prior to trial also recommended termination of parental rights.

According to the counselor, it would be extremely difficult for C to ever trust Mother because she failed to protect him from the severe abuse during the years he lived with her and her cohabitants. The counselor added C "has serious psychological damage" as a result.

We hold the trial court properly considered the conditions and acts listed in paragraphs (a) through (d) of § 211.447.-2(2). The trial court's findings on those factors are specific and complete, and the findings adverse to Mother are amply supported by the evidence. Part "A" of Mother's first point is without merit.

As to part "B" of her first point, Mother maintains she completed the requirements of her treatment plans. She asks why, if her parental rights are to be terminated, the treatment plans were ordered in the first place.

■ The obvious answer is that when case JU188–325J was opened, no one could predict the future. One of the goals was to reunite C and Mother if, by counseling and treatment of each, that became a viable option.

■ However, in a proceeding to terminate parental rights, the primary concern is the best interest of the child. *In the Interest of M.E.W.*, 729 S.W.2d 194, 195[1] (Mo. banc 1987). Here, a clinical psychologist, a DFS caseworker, and a counselor all testified there was no close emotional attachment by C to Mother. The counselor opined the relationship between C and Mother could not be repaired. Another DFS caseworker testified there was insufficient information to know whether C could ever be returned to Mother's custody. No witness recommended that be done.

In sum, even though Mother complied with her treatment plans, it was evident the objective of restoration of custody had not been achieved at time of trial and perhaps never would be. A DFS caseworker testified that if the agency cannot "establish that the child is in a safe and secure home placement over a period of time, then it would be reasonable to recommend termination." Compliance with a treatment plan does not preclude termination of parental rights. *In the Interest of C.M.M.*, 757 S.W.2d 601, 605–06[2] (Mo.App.1988). Part "B" of Mother's first point is denied.

Part "C" of Mother's first point, as we fathom it, is that the trial court failed to consider and adhere to the seven factors listed in subdivisions (1) through (7) of subsection 3 of § 211.447.

■ In its order terminating parental rights, the trial court made specific findings on the factors applicable to the instant case. One such finding was:

[T]here are no possible services available that would possibly bring about lasting parental adjustment enabling the return of said minor child to his biological mother ... within an ascertainable period of time.

The above finding was responsive to subdivision (4) of subsection 3 of § 211.447.

We need not extend this already lengthy opinion by setting forth all the trial court's findings pertinent to § 211.447.3. They are specific, supported by ample evidence, and demonstrate the trial court properly considered the appropriate factors. We reject part "C" of Mother's first point.

Part "D" of Mother's first point avers the trial court's findings were against the weight of the evidence and unsupported by substantial evidence.

Earlier in this opinion we discussed the statutory basis for termination and the findings pertinent thereto, together with the evidence supporting them. We hold the findings on which the trial court based its order of termination are supported by substantial evidence, are not against the weight of the evidence, and no error of law appears. Further discussion of part "D" of Mother's first point is unnecessary. The first point is denied.

Mother's second point charges the trial court with error in taking judicial notice of case CR489–378FX1, described in the transcript as "a Greene County Circuit Court case ... State versus Michael B____." Mother asserts, "[S]aid file contained prejudicial and inflammatory facts and matters

which were considered by the trial court to the detriment of [Mother]."

The first flaw in this assignment of error is that it was not preserved in the trial court for appellate review. Mother's lawyer registered no objection when the trial court took judicial notice of CR489–378FX1.[5] Where no objection is made when evidence is introduced at trial, error in its admission cannot be assigned on appeal. *Wilhoit v. Fite*, 341 S.W.2d 806, 817[20] (Mo.1960); *Reger v. Nowotny*, 226 S.W.2d 596, 598[8] (Mo.1950); *Griffith v. Adair*, 796 S.W.2d 443, 446[2] (Mo.App. 1990).

Secondly, Mother has failed to file the record in CR489–378FX1 with us. When an exhibit is omitted from the transcript on appeal and is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to the appellant. *Doyle v. Doyle*, 786 S.W.2d 620, 621[1] (Mo.App.1990); *Welch v. Welch*, 633 S.W.2d 447, 450 (Mo.App.1982); *Godsy v. Godsy*, 531 S.W.2d 547, 553[9] (Mo.App.1975).

Finally, in a court-tried case it is presumed the trial court considered only properly received evidence; the erroneous admission of evidence requires reversal only when there is insufficient competent evidence to support the trial court's judgment. *State ex rel. Webster v. Cornelius*, 729 S.W.2d 60, 65[7] (Mo.App.1987); *Keen v. Dismuke*, 690 S.W.2d 822, 825[4] (Mo. App.1985).

Here, one of Mother's own exhibits showed that Michael B____ pled guilty to the homicide charge resulting from Michelle's death and received a life sentence. Consequently, that fact was established independently of the record in CR489–378FX1. Mother has failed to demonstrate any prejudice from the judicial notice of CR489–378FX1.

Mother's second point is denied, and the order terminating parental rights is affirmed.

PREWITT, P.J., and PARRISH, J., concur.

---

**5.** The lawyer representing Mother in this appeal is not the lawyer who represented her at trial.