**In the Interest of S.H. and S.H., Jr.**

**JUVENILE OFFICER, Respondent,**

v.

**M.F.–Natural Mother, Appellant.**

**Nos. WD 50046, WD 50053.**

Missouri Court of Appeals,
Western District.

Feb. 13, 1996.

Kelly J. Moorehouse, Watson & Marshall, Kansas City, for appellant.

Kay Madden, Kansas City, for Guardian Ad Litem.

Lori Stipp, Kansas City, for respondent.

Before SPINDEN, P.J., and BRECKENRIDGE and SMART, JJ.

BRECKENRIDGE, Judge.

M.F. appeals the termination of her parental rights to her daughter, S.H., and her son, S.H., Jr., pursuant to § 211.447.2(3), RSMo 1994.[1] M.F. contends that the decision of the

---

1. All statutory references are to the Revised Statutes of Missouri 1994.

trial court was against the weight of the evidence and contrary to existing law; termination of her parental rights was not in the best interests of her children; and a parent with a chemical dependency should have the ability to "repent" of past conduct in the same manner that a parent can repent abandonment when faced with termination of parental rights pursuant to § 211.447.2(1).

The judgment of the trial court is affirmed.

▉▉▉ This court will affirm the trial court's termination of parental rights unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *In Interest of J.L.M.,* 848 S.W.2d 502, 504 (Mo.App.1993). In reviewing a court-tried case to determine whether the court's judgment is grounded upon sufficient evidence, this court must act with caution and will reverse only upon a firm belief that the judgment is wrong. *Id.* Furthermore, this court must examine the facts in the light most favorable to the trial court's order. *Id.*

S.H., Jr. was born on November 17, 1990. On July 12, 1991, the Juvenile Officer filed a petition which alleged that S.H., Jr. had been abandoned by M.F. M.F. had left the child with a third party who requested that the child be taken out of the third party's custody. At the first detention hearing on July 17, 1991, M.F. informed her Division of Family Services (DFS) social worker, Patty Raouf, that she was using drugs, so Ms. Raouf referred M.F. for drug screening and treatment. On November 7, 1991, the trial court sustained the petition and committed S.H., Jr. to the custody of the DFS.

On December 6, 1991, M.F. gave birth to a daughter, S.H., who was born with traces of cocaine in her system. Prior to the birth of S.H., M.F. had not made any effort to comply with the DFS referral for drug screening and treatment. Upon the birth of S.H., M.F. agreed to enter the North Star drug rehabilitation center for inpatient treatment, where she could keep S.H. with her rather than have S.H. taken into DFS custody.

S.H. remained in M.F.'s custody at North Star for the duration of the inpatient treatment program. Initially, M.F. had regular visitation with S.H., Jr. while she was in the facility. Then, in February of 1992, S.H., Jr. was returned to M.F.'s custody while she was still an inpatient at the North Star facility.

M.F. successfully completed the inpatient program at North Star, and in March, 1992, M.F. and the two children moved into an apartment which had been located by the North Star staff. Through March and April, M.F. neglected to attend any therapy outpatient sessions with North Star. In May, M.F. signed an agreement with DFS which required M.F. to go to therapy. On May 21, 1992, the juvenile court ordered M.F. to participate in a follow-up outpatient treatment program.

Starting in June of 1992, M.F. again began to miss the outpatient sessions. There were no urine screens, because the treatment program was unable to request them. M.F. was discharged from the program for lack of compliance on July 2, 1992.

On July 13, 1992, the juvenile officer filed a petition in the interest of S.H., alleging that M.F. had a history of cocaine abuse and although M.F. successfully completed an inpatient substance abuse program, she had missed five consecutive aftercare sessions, was not maintaining contact with her counselor, and was not maintaining contact with her DFS worker. On July 14, 1992, the juvenile officer filed a motion to modify in the interest of S.H., Jr., stating the same allegations.

Faye Short, who was M.F.'s social worker from December of 1991 to August of 1993, testified that M.F. ceased contact with her in the middle of June, 1992. Ms. Short was unable to locate M.F. despite visits to her apartment and calls to her grandmother's house. In August or September of 1992, M.F. was incarcerated on prior drug charges, although this fact was not known to Ms. Short. In the fall of 1992, DFS found that M.F. had left the children with a man named Gary Herndon. Mr. Herndon was allegedly the father of both children.[2]

---

**2.** The original petition filed in the interest of

S.H., Jr. identified S.H., Jr.'s father as S. H., Sr.,

On October 2, 1992, the Juvenile Officer filed a motion to modify the disposition order concerning S.H., Jr., and an amended petition in the interest of S.H., adding the further allegation that M.F. was incarcerated and unable to provide proper custody and care for the children. At a hearing on October 13, 1992, M.F. admitted the allegations as amended. The juvenile court determined that S.H. was in need of care and treatment, and both S.H. and S.H., Jr. were committed to DFS custody for placement with Mr. Herndon.

M.F.'s whereabouts remained unknown for months thereafter, and Ms. Short spoke with M.F. only once between June of 1992 and July of 1993, when the case was transferred to another social worker. Ms. Short testified that, during the period that the children were in the custody of Mr. Herndon, M.F. did not send any support that Ms. Short was aware of, and M.F. visited the children only occasionally.

On May 21, 1993, the Juvenile Officer filed a motion to modify the placement of the children alleging that Mr. Herndon was not certain that he was the father of the children, and that Mr. Herndon's sister was no longer willing to care for the children. A hearing was held, and the children were placed into foster care.

Monica Hogue was M.F.'s social worker from August of 1993 through January of 1994. When Ms. Hogue was first assigned the case, she attempted to reach M.F. by communicating with her grandmother. A few days later, M.F. telephoned Ms. Hogue, and Ms. Hogue told her that she needed to set up an appointment with her. According to Ms. Hogue, M.F. refused to provide an address or telephone number where she could be reached.

In October of 1993, M.F.'s probation was revoked for failing to complete a substance abuse program, and she was incarcerated in the Missouri Department of Corrections under a sentence which permitted the court to release her on probation after she served 120 days. In November of 1993, Ms. Hogue learned that M.F. was located at the Renz Correctional Center in Jefferson City. Ms. Hogue telephoned the facility and spoke with M.F. After that time, Ms. Hogue sent M.F. some letters, and M.F. sent one letter to Ms. Hogue requesting visitation. Ms. Hogue received the letter shortly before the case was transferred, but she did not know if the visitation took place. Ms. Hogue also testified that she was not aware of any financial support which M.F. provided to S.H. or S.H., Jr.

On January 21, 1994, the Juvenile Officer filed petitions to terminate M.F.'s parental rights to S.H. and S.H., Jr., alleging that S.H. and S.H., Jr. had been under the jurisdiction of the juvenile court for over a year and that potentially harmful conditions continued to exist. Specifically, the petition alleged that M.F. failed to consistently attend and participate in drug treatment, that M.F. failed to maintain regular visitation with S.H. and S.H., Jr., that M.F. failed to maintain contact with her social worker, and that M.F. generally failed to work toward reunification with S.H. and S.H., Jr.

M.F. was released from incarceration in February of 1994 and was placed on probation. The terms of M.F.'s probation included a requirement that she attend and complete a substance abuse program, and that she submit to urine tests for detecting drug use.

On July 6, 1994, the trial court held an evidentiary hearing on the petitions for termination. After hearing the evidence, the trial court terminated M.F.'s parental rights to S.H. and S.H., Jr. on the grounds that the children had been under the jurisdiction of the juvenile court for a period exceeding one year, and that conditions of a potentially harmful nature continued to exist.

In her first point on appeal, M.F. claims that the trial court erred by terminating her parental rights on the ground that conditions of a potentially harmful nature continued to exist. M.F. contends that the decision was

and the original petition filed in the interest of S.H. stated that the identity of her father was unknown. Both S.H., Sr. and Gary Herndon are alleged to be the putative fathers of S.H., Jr. and S.H. in the petitions for termination, and their parental rights were terminated. Neither appeals that determination.

contrary to existing law and against the weight of the evidence, which she maintains showed that the potentially harmful conditions had been rectified. M.F. also contends that the termination of her parental rights is not in the best interests of the children.

■ To terminate the rights of a parent, there must be clear, cogent, and convincing evidence that one or more of the grounds for termination under § 211.447 exists and that termination of parental rights is in the child's best interests. *In Interest of W.S.M.*, 845 S.W.2d 147, 150 (Mo.App.1993). The party seeking to terminate parental rights by invoking the statute must carry the full burden of proof. *In Interest of Baby Girl W.*, 728 S.W.2d 545, 547 (Mo.App.1987).

■ The clear, cogent, and convincing evidence required to justify the termination of parental rights is evidence that "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In Interest of C.K.G.*, 827 S.W.2d 760, 765 (Mo.App.1992). This standard of proof may be met even though the court has contrary evidence before it. *Id.*

■ The trial court terminated M.F.'s parental rights pursuant to § 211.447.2(3). This court, in *In Interest of K.D.H.*, 871 S.W.2d 651, 656 (Mo.App.1994), interprets that statutory provision as follows:

> For cases to be grounded on section 211.447.2(3), several requirements must be met: (1) The child must have been under the jurisdiction of the juvenile court for at least one year; and (2) either (a) the conditions which originally led the court to assume jurisdiction must still persist, or conditions of a potentially harmful nature continue to exist, and there is little likelihood that these conditions will be remedied at an early date so the child can be returned to the parent in the near future; or (b) the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

The statutory language permitting the court to consider "conditions of a harmful nature [that] continue to exist" is an explicit statement that harmful conditions not originally considered could form the basis of a termination of parental rights. *In Interest of R.H.S.*, 737 S.W.2d 227, 235 (Mo.App.1987).

■ M.F. argues that all of her difficulties, including her failure to provide a stable home environment and her incarcerations, have been attributable to her substance abuse, and she asserts that she has recently overcome her drug-use problem. Consequently, she contends she has eliminated the one true potentially harmful condition in this case, and therefore the trial court's order should be reversed.

This court must consider M.F.'s argument in the context of the burden of proof requiring clear, cogent, and convincing evidence in this case. This means that, when weighed against any evidence that M.F. has overcome her substance abuse problem, the evidence that the potentially harmful condition of M.F.'s drug problem continues to exist with little likelihood of being remedied at an early date must instantly tilt the scales in favor of termination. *In Interest of C.K.G.*, 827 S.W.2d at 765.

In support of her contention that she has overcome her drug problem, M.F. points to the cross-examination testimony of Norma Kay Burton, who was M.F.'s DFS worker at the time of the termination hearing. Ms. Burton gave the following testimony:

Q. And, also, [M.F.] is currently on parole; is that correct?

A. Yes.

Q. And you have had contact with her parole officer?

A. Yes.

Q. And one of the conditions of her parole is that she attend and complete a substance abuse program and have no positive urine screens, is that correct?

A. Yes.

Q. And he has referred her to the Renaissance West Program, is that correct?

A. She has attended there. I'm not sure whether he or she instigated it.

Q. Okay, but that's where she's going; is that correct?

A. Yes.

Q. And up until recently, her counselor there was Cathy [sic] Ward; is that correct?

A. Yes.

Q. And Ms. Ward has indicated that all of her urine screens have been negative, is that correct?

A. Yes.

M.F. also cites the testimony of her witness, Vernetta Guytan, M.F.'s aunt by marriage for about five years. Ms. Guytan, who also had a drug problem, had attended a drug treatment program with M.F. She testified that M.F.'s attitude about treatment was different after her release from prison, and that M.F. is "now at the stage where she wants to do it yourself." According to Ms. Guytan, M.F. is good with children and has strong family support.

There are a number of factors which could diminish the persuasiveness of the evidence relied upon by M.F. M.F. did not testify herself as to the nature of her drug treatment or her current circumstances. There was no testimony from any professional actually involved in treating or testing M.F. for substance abuse during this period. Ms. Burton's testimony establishes little because it is second-hand information that does not provide details about the frequency, duration, or reliability of the drug screens, or about the nature of M.F.'s participation in the substance abuse program. Ms. Burton stated on direct examination that it was her recommendation that M.F.'s parental rights be terminated so that the children could be adopted into a stable, permanent home. In addition, Ms. Guytan's relationship to M.F., both familial and through shared drug treatment, raises the potential for bias in favor of M.F.

More importantly, M.F. ignores conflicting evidence. A termination report is required by § 211.455.3 to aid the court in determining whether termination is in a child's best interest. The report evaluates the fitness and capacity of the parent to discharge parental responsibilities, the child's home, present adjustment, and physical, emotional and mental condition, along with other facts pertinent to the determination. The termination report here, as well as an addendum covering the most recent months before the termination hearing, was prepared by Ms. Burton and admitted into evidence as an exhibit at the termination hearing.

In the original termination report dated April 11, 1994, Ms. Burton reports that M.F. was not consistent with any substance abuse program. She was screened and enrolled in a program and attended two Saturday morning group sessions just before her March 15th criminal court hearing, but none since. The report further indicates that M.F. had asked for visits and custody of her children after being released on probation, but "she has not been regular in her treatment program or shown any stability." Although the termination report refers to a report from M.F.'s therapist, Kathy Ward, no report is included.

The addendum, dated June 21, 1994, reports that M.F. is enrolled at Renaissance West where she attends once a week and has had clean urine screens. The treatment program refused to release any other information to DFS due to confidentiality restrictions.

 It is clear that the trial court did not attach persuasive weight to the testimony upon which M.F. now relies. The trial court could have found that some or all of M.F.'s evidence is not credible, and this court defers to the trial court's ability to determine the witnesses' credibility and to choose between conflicting evidence. *In Interest of W.S.M.,* 845 S.W.2d at 151. In addition or alternatively, the court may simply not have found the evidence compelling. A short-term improvement in circumstances which occurs after the filing of the petition for termination is less apt to be persuasive. *In Interest of J.M.,* 815 S.W.2d 97, 103 (Mo.App.1991).

In weighing the testimony relied upon by M.F. against the evidence that the potentially harmful condition of M.F.'s drug problem continues to exist with little likelihood of being remedied at an early date, this court is aware that past patterns provide vital clues to present and future conduct, and that all

grounds for termination to some extent look to past conduct. *In Interest of M.L.W.*, 788 S.W.2d 759, 762 (Mo.App.1990). M.F. has a history of drug abuse and of a failure to rectify the problem. M.F. refused to address her drug problem until S.H. was born with cocaine in her system and she faced the removal of S.H. to DFS custody. After her release from the North Star in-patient treatment program, M.F. failed to successfully participate in the substance abuse aftercare program and made only one contact with her DFS worker, Ms. Short, between June of 1992 and July of 1993. M.F. persisted in her drug abuse causing two incarcerations and her resulting unavailability to S.H. and S.H., Jr. After M.F.'s last incarceration, her inconsistent attendance at drug treatment continued to show a lack of commitment, until three months before the termination hearing. In addition, there was no evidence that M.F. provided support to S.H. and S.H., Jr., and M.F.'s attempts at visitation were token at best.

When the testimony relied upon by M.F. is weighed against M.F.'s history of drug abuse and her failure to rectify such problem, her lack of work toward reunification, and inability to provide a stable environment for S.H. and S.H., Jr., the trial court's decision was not against the weight of the evidence. In *In Interest of K.D.H.*, 871 S.W.2d at 652–53, 657, this court held that where, as here, there was a failure to successfully participate in a substance abuse aftercare program, combined with a history of an inability to rectify a substance abuse problem, provide a stable home environment, or maintain regular contact with one's children, the evidence is sufficient to justify termination of parental rights pursuant to § 211.447.2(3).

■ M.F. argues that the facts of this case differ significantly from other cases dealing with substance abuse where the period of drug abuse is much longer and the number of failed treatment attempts is much higher. M.F. cites, in support of her argument, *In Interest of K.M.B.*, 883 S.W.2d 123, 125 (Mo.App.1994); *In Interest of E.B.S.*, 876 S.W.2d 8, 10–11 (Mo.App.1994); *In Re Interest of F.L.M.*, 839 S.W.2d 367, 370–71 (Mo. App.1992); and *In Interest of J.M.*, 815

S.W.2d at 98–99. Although these cases rely upon the failure to rectify a chemical dependency for a much longer period, they do not benefit M.F. The relevant time period established by § 211.447.2(3) is one year. If one year after a child was placed under the jurisdiction of the juvenile court, it does not appear that potentially harmful conditions will be rectified, the court has the power to terminate parental rights.

■ M.F. also claims that the termination of her parental rights is not in the best interests of S.H. and S.H., Jr. M.F. points out that the foster parents having custody of S.H. and S.H., Jr. at the time of trial did not wish to adopt them. She argues that, since another placement will be necessary, the best interests of S.H. and S.H., Jr. would be served by reunification with their mother. M.F. contends that, in holding otherwise, the trial court ignored the preference of preserving the parent/child relationship.

■ Although reunification of the family is the desired outcome of DFS involvement, the best interests of the child takes priority over reunification. *In Interest of N.D.*, 857 S.W.2d 835, 841 (Mo.App.1993). Termination has been held to be in the best interests of the child where the child has spent the better portion of the child's life in the custody of others, where the mother has failed to improve her conduct to regain custody of her child, where the child has shown little emotional ties to the mother, and where adoption would be more difficult the longer the child remains in temporary foster care. *In Interest of J.A.A.*, 829 S.W.2d 79, 83 (Mo.App. 1992).

S.H., Jr. has been in M.F.'s custody only fourteen or fifteen months since his birth on November 17, 1990. S.H. was born on December 16, 1991, and has been in M.F.'s custody only eight or nine months of her life. Neither child has been in M.F.'s custody since August or September, 1992, when she left them with Mr. Herndon. The only evidence in the record on appeal concerning the children's emotional ties to M.F. is the testimony of M.F.'s first DFS worker, Ms. Raouf. Ms. Raouf indicated the absence of such ties between S.H., Jr. and M.F. when S.H., Jr.

was first removed from her custody. It is believed that S.H., Jr.'s slow developmental skills are due to the instability of his family and the trauma of his parents coming in and out of his life. Additionally, both S.H. and S.H., Jr. have adapted well to foster care and are beginning to thrive. There is sufficient evidence to support a finding that termination is in the best interests of the children. Point denied.

In her second point on appeal, M.F. argues that, as a matter of public policy in cases involving chemical dependency, the court should allow a parent to "repent" past conduct resulting from a drug problem, in the same manner that a parent can repent abandonment and thereby avoid termination of parental rights on the basis of § 211.447.2(1).

The evidence on which M.F. relies as demonstrating her reform or repentance has occurred since the filing of the termination petition, and M.F. argues that there is nothing in § 211.447.2(3) which prevents this court from considering the conduct of a parent following the filing of a petition. This is true, but as noted in the previous point on appeal, an appellate court is less apt to be persuaded by a short-term improvement in circumstances which occurs after the filing of the petition for termination. *In Interest of J.M.*, 815 S.W.2d at 103. Indeed, a parent's token effort to demonstrate a change will not be sufficient. *See In Interest of R.R.T.*, 744 S.W.2d 829, 832–33 (Mo.App.1988).

In any event, the safeguard that a parent can avoid termination of parental rights by sufficiently reforming his or her behavior or circumstances is already an integral part of the termination decision pursuant to § 211.447.2(3). This statute requires the juvenile court to consider if a parent has rectified or is likely to rectify those conditions which led to the assumption of jurisdiction, or those potentially harmful conditions which have arisen since. *See In Interest of M.E.W.*, 729 S.W.2d 194, 196 (Mo. banc 1987). Here, there was sufficient evidence for the trial court to conclude that the potentially harmful conditions have not been recti-

fied, and that there is little likelihood of the conditions being rectified at an early date. Point denied.

The judgment of the trial court is affirmed.

All concur.