**In the Interest of F.N.M., a minor.**

**M.B.M., Appellant,**

**v.**

**E.C. and G.C., Respondents.**

**No. 71466.**

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 26, 1997.

Connie Hood, Private Atty., Margaret Donnelly, Guardian Ad Litem, St. Louis, for appellant.

Rita M. Montgomery, L.L.C., St. Louis, for respondents.

GARY M. GAERTNER, Judge.

Appellant, M.B.M. ("mother"), appeals the judgment of the Circuit Court of the City of St. Louis terminating her parental rights with respect to her son, F.N.M. ("son"). We affirm.

■ The trial court's judgment terminating a parent's rights in a child will be sustained unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously applies or declares the law. *In Interest of K.O.*, 933 S.W.2d 930, 934 (Mo.App. E.D. 1996). The facts, and the reasonable inferences therefrom, are viewed in the light most favorable to the judgment, and great deference is given the trial court with respect to findings of fact and credibility of witnesses. *Id.*

The facts of this case are as follows. Son was born out of wedlock on January 20, 1992, to mother and the biological father, N.T.[1] Son was premature (twenty-eight weeks gestation) and, due to prenatal exposure to alcohol, marijuana, cocaine, and heroin, suffered from a plethora of medical diseases and disabilities: mild hyaline membrane disease, anemia, hyperbilirubinemia, apnea, bradycardia, broncho-pulmonary dysplasia, klebsiella pneumonia, severe T-cell immuno-deficiency, pulmonary edema, endocarditis, metabolic acidosis, retinopathy of prematurity, spinal cyst, and gastro-esophageal reflex. Son was hospitalized in neonatal intensive care for the first fifteen months of his life, and underwent

1. N.T. consented to the termination of his parental rights.

a tracheostomy and a gastronomy on June 1, 1992.

An order temporarily transferring custody of son to the Division of Family Services ("DFS") was entered June 11, 1992. Mother was arrested for money laundering shortly afterward, and has been incarcerated on a continuous basis since July 1992. Mother would eventually be sentenced to a total of ten years in federal prison on the money laundering charges, with a minimum release date in 2001.

On December 11, 1992, the trial court entered an Order of Disposition transferring legal custody of son to DFS and ordering mother to maintain contact with son via telephone or written correspondence, enroll in and complete a substance abuse program and provide proof of the same to the court, secure adequate housing and maintain such for ninety days prior to the return of son's legal custody, enroll in and complete homemaking and parental skills training programs, and cooperate with and utilize the services offered or provided by DFS.

On May 1, 1993, son was placed in the foster home of respondents E.C. and G.C. ("petitioners"), where he remained up to the date of the termination hearing.

On March 15, 1996, petitioners filed a petition to terminate mother's parental rights in son. Cause was heard on August 16, 1996. Testifying on behalf of petitioners were Barbara Pelton, a social service worker with DFS assigned to son's case from May to October of 1993; Alise Barton, a social service worker with DFS assigned to son's case from December 1995 up to the date of the hearing; and Nancy Leo, a deputy juvenile officer assigned to son's case on September 9, 1994.

Barbara Pelton testified: Mother visited son at the hospital a few times between the date of son's birth (January 20, 1992) and the date the trial court entered its Order of Disposition transferring custody of son to DFS (December 11, 1992). On two of these visits, hospital staff noted the odor of alcohol on mother; on another visit, mother was accompanied by son's father and "they were both intoxicated." According to Pelton, "The

hospital stated that [mother] was hostile when she visits, did not participate in [son]'s care and only visited fifteen to twenty minutes and no bonding occurred with the child during the visits." The visits stopped after June 1992 due to mother's arrest and incarceration.

Pelton's records indicated mother did not cooperate with or utilize the services provided or offered by DFS. An initial written service agreement was written on June 17, 1992, but mother never signed it. On November 15, 1994, and July 28, 1996, mother signed two separate written service agreements. Mother presented DFS with certificates stating she had completed sixty hours of a parenting program and forty hours of a drug and alcohol program since entering federal prison, but DFS had no information as to the programs' content or the scope of what was covered, and, as far as Pelton knew, those programs had not been approved by DFS or the trial court. Since her incarceration mother sent son cards, letters, and some gifts, as well as a total of $125 in support, but had no physical contact with son since her last hospital visit on June 23, 1992.

Pelton asserted son had no emotional ties to mother, but was "very attached" to his foster parents, petitioners. Son, by then four years old, exhibited extensive physical, mental and psychological problems such as significant development delay, autistic behavior, attention deficit disorder, hyperactivity, and chronic lung disease with frequent upper respiratory infections. Although son had special needs due to these problems and required extensive therapy, said needs were being met by petitioners. Nothing in the records showed mother had been instructed about the kind of special assistance and care son would need, or that the parenting class she attended addressed the particular needs of son. Nor did anything show mother asked for services or assistance in complying with the court's Order of Disposition, or in understanding son's special needs.

Alise Barton agreed her testimony as to the circumstances in which son came into DFS's care, and the contacts DFS had had with mother, would not vary from Pelton's account. Barton's records indicated mother

signed two written service agreements, the terms of which mirrored the requirements set out by the trial court in its December 11, 1992 Order of Disposition, but mother failed to comply with those agreements. Mother did not request services from DFS to help her comply with the Order of Disposition, nor had she taken any steps to have DFS recommend or approve any programs available to her in federal prison. Barton testified son's needs were being met by petitioners, and he had "bonded well" with them as parents. Barton believed it was in the best interests of son that he be allowed to remain with petitioners.

Nancy Leo testified mother did not make any requests for services or referrals for the purpose of assisting her in satisfying the trial court's requirements set out in its Order of Disposition. Leo also testified she did not think mother "really understood the full impact of what [son's] special needs were and how much care he would have to have."

Barbara Pelton, Alice Barton, and Nancy Leo each testified it was in son's best interests that mother's parental rights be terminated. Son's guardian ad litem ("GAL"), also present at the hearing, concurred.

Mother testified on her own behalf, by means of a telephone hook-up from the federal prison in which she was incarcerated. Mother admitted the last time she had actual physical contact with son was in June of 1992; claimed her earliest release date was 1998, but offered no documentation in support of this claim; and, claimed she paid support to son when she was able to provide it. Mother further testified she was taking classes and participating in activities in prison to prepare her for reunification with son. Specifically, mother claimed she became certified as a hospice worker to "learn a little bit more about medical needs[;]" enrolled in a sign language class; volunteered in the children's center; and spoke with the prison psychologist's wife about autism. Mother believed she could provide for son when she was released from prison, but when asked

what made her think that, mother answered, "I don't have it made out in my mind."

On August 16, 1996, the trial court entered judgment terminating mother's parental rights in son.[2] This appeal followed.

Mother raises two points on appeal. First, mother claims the trial court's judgment terminating her parental rights in son was inconsistent with the intent of the applicable Missouri statutes and the best interests of son. We disagree.

Before a court can terminate the rights of a parent, there must be clear, cogent, and convincing evidence that one or more of the grounds listed under RSMo section 211.447.2[3] exists, and that such termination would be in the child's best interests. *In Interest of S.H.*, 915 S.W.2d 399, 403 (Mo.App. W.D.1996). The parties seeking termination of parental rights—in this case, petitioners—bear the burden of proving their case by clear, cogent and convincing evidence, such that the finder of fact " 'is left with an abiding conviction that the evidence is true.' " *Id.* (citation omitted.) "This standard of proof may be met even though the court has contrary evidence before it." *Id.*

The trial court terminated mother's parental rights in son pursuant to RSMo section 211.447.2(3), under which several requirements must be met: (1) the child must have been under the juvenile court's jurisdiction for a period of one year; and (2) either (a) the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, and there is little likelihood those conditions will be remedied at an early date so the child can be returned to the parent in the near future; or (b) the continuation of the parent-child relationship will greatly diminish the child's prospects for early integration into a stable and permanent home. *S.H.*, 915 S.W.2d at 403. Further, in determining whether to terminate parental rights under this subsection, the trial court must make findings as to the four specified conditions or acts of the parent set out in RSMo section

---

2. The trial court subsequently entered judgment granting petitioners' petition to adopt son.

3. All statutory references are to RSMo 1994.

211.447.2(3)(a)—(d). *In Interest of D.A.H.,* 921 S.W.2d 618, 623 (Mo.App. W.D.1996).

In this case, the trial court found the following: son had been under the court's jurisdiction for at least a year; the conditions which led to the assumption of jurisdiction persisted, or conditions of a potentially harmful nature continued to exist and there was little likelihood such conditions will be remedied soon; and, continuation of the parent-child relationship would diminish son's prospects for early integration into a stable and permanent home. The court further found: mother entered into two social service plans with DFS but failed to comply with all their terms; the juvenile officer and/or DFS or other agency had been unsuccessful in aiding the biological parents on a continuing basis in adjusting their circumstances or conduct to provide a proper home for son; there was no evidence that either of the parents suffered from a mental condition; and there was evidence mother had a history of chemical dependency for which she has not completed treatment and which would adversely affect her ability to provide son the necessary care, custody, and control. The facts set out above support all these findings.

The trial court made further findings under RSMo section 211.447.3, which requires findings on the factors set out therein that the court deems appropriate and applicable to the case. *In Interest of R.H.S.,* 737 S.W.2d 227, 238 (Mo.App. W.D.1987). The court found: son had no emotional ties to his biological parents; neither biological parent maintained regular visitation or other contact with son, and mother had no physical contact with son since he came into DFS' care; mother made "token contributions" of $125 in support to her son, but failed to make any other payment or provision for the cost and care of her son when financially able to do so; additional services to the biological parents would not likely bring about a lasting parental adjustment enabling son's return to the parents within an ascertainable period of time; and, "the biological parents have not demonstrated an interest or commitment to the child, who has extensive medical needs." *See* RSMo section 211.447.3(1)—(5). The court also noted mother had been incarcerated since July 1992 and was currently serving a total of ten years in federal prison. *See* RSMo section 211.447.3(6).

Again, these findings are supported by the above facts. The most arguable finding is that mother did not demonstrate an interest in son; she did send gifts, cards, letters and a few payments of support, and also claimed she was taking classes and participating in activities in prison to help her with son's needs upon their reunification. However, in light of the evidence on the entire record, the trial court could reasonably deem these actions superficial gestures. Mother's drug and alcohol abuse during her pregnancy directly caused son's physical problems. Her behavior prior to her arrest belie an interest in son. Further, mother was vague, at best, when asked exactly how she would provide for son when released from prison.

We find there was sufficient evidence to justify termination of mother's parental rights in son pursuant to RSMo section 211.447.2(3). We now turn to the question of whether termination of mother's parental rights would be in the best interests of son.

While reunification of the family is the desired outcome of DFS involvement, the child's best interests take priority over reunification. *S.H.,* 915 S.W.2d at 405. "Termination has been held to be in the best interests of the child where the child has spent the better portion of the child's life in the custody of others, where the mother has failed to improve her conduct to regain custody of her child, where the child has shown little emotional ties to the mother, and where adoption would be more difficult the longer the child remains in temporary foster care." *Id.* At least two of these factors were clearly present here: the evidence was uncontroverted that son had been in the custody of petitioners for nearly all of his young life, and he had no emotional bond with mother.

Further, while incarceration, in and of itself, may not be used as a ground for terminating parental rights, such incarceration "does not excuse a parent's obligation to provide the parent's child with a continuing relationship, and parental rights may properly be terminated while the parent is incarcer-

ated." *In Interest of M.L.K.*, 804 S.W.2d 398, 402 (Mo.App. W.D.1991). Due to her incarceration, mother has not had actual physical contact with son since June of 1992, when son was five months old. Her earliest release date is in 2001, by which time son will be nine years old. Mother, then, will have effectively missed the first decade of son's life.

Additionally, son has special physical, educational, and emotional needs which require extensive attention and resources which mother cannot provide now or in the foreseeable future, but which petitioners can provide and have been providing. *See In Interest of M.E.W.*, 729 S.W.2d 194, 197 (Mo.banc 1987). Further, son had been in petitioners' home for three years by the time of the hearing, had "bonded well" with them as parents, and was "very attached" to them. "The potential for harm to the child's emotional well-being increases when custody changes remove him from a stable parent-child relationship." *Id.*

Finally, petitioners' witnesses, as well as son's GAL, unanimously asserted that termination of mother's parental rights would be in son's best interests. We defer to the trial court with respect to the credibility of witnesses. *K.O.*, 933 S.W.2d at 934. In sum, the trial court did not err in terminating mother's parental rights. Point denied.

■■ For her second point on appeal, mother claims the ineffective assistance of her counsel denied her a meaningful hearing, thereby violating her constitutional right to due process. Again, we disagree.

■■ If a parent subject to an action to terminate his or her parental rights is financially unable to employ counsel, counsel shall be appointed. RSMo section 211.462.2. "Missouri has recognized the statutory right to counsel includes the right to effective assistance of that counsel.... [T]he test is whether the attorney was effective in providing his client with a meaningful hearing based on the record." *In Interest of J.M.B.*, 939 S.W.2d 53, 55–56 (Mo.App. E.D.1997).

Few cases in Missouri have dealt with claims of ineffective assistance of counsel in the context of termination hearings, and only two decisions have held that counsel rendered such ineffective assistance that the parents whose rights were terminated were denied a meaningful hearing. Examination of these two decisions is instructive.

In *J.M.B.*, 939 S.W.2d at 56, counsel did not request a continuance or recess to secure the absent mother's presence; did not raise a single objection during direct examination of the only witness at the hearing; limited cross-examination to a dozen questions, only three of which concerned the crucial issue at the hearing; offered no evidence, argument or explanation on behalf of the mother; and stated his belief, as the mother's GAL, that her parental rights should be terminated. As this Court observed, "It appears from the record counsel did little as mother's counsel beyond appear for the hearing." *Id.* In *Interest of J.C., Jr.*, 781 S.W.2d 226, 228 (Mo. App. W.D.1989), the natural parents' counsel was "entirely passive[:]" he stipulated to all of juvenile officer's evidence despite the many objections he could have raised, waived cross-examination, did not call available witnesses, offered no evidence on behalf of the natural parents, and made a statement indicating it was a foregone conclusion to everyone at the hearing that the natural parents' rights would be terminated.

■■ By contrast, mother's counsel's performance does not approach the passivity of the attorneys in *J.M.B.* and *J.C., Jr.* Counsel cross-examined each of the petitioners' witnesses, offered evidence on mother's behalf (mother's testimony), and advocated for her client by means of closing argument. Mother does not point out any specific objections to petitioners' evidence that counsel waived. Finally, we reject mother's contention that the following statement of counsel, made at the conclusion of the hearing after mother had hung up, "implies at least tacit approval of the termination of the parental rights of her own client[:]"

[MOTHER'S COUNSEL]: Again, I know it's unfair, and this is about the interest of the child, to have this child in limbo until my client is released from prison; but, I simply ask that the Court in making its determination simply consider

what my client has done to prepare for the reunification of her son.

Counsel was acknowledging it was unfair to keep son in an uncertain status until mother was released from prison, an obvious point; yet counsel, in her last statement, argued against terminating mother's parental rights. This was not "tacit approval" of the trial court's termination of mother's parental rights.

The record does not reflect mother's counsel was so passive or rendered ineffective assistance of such a nature as to deny mother a meaningful hearing. *See In Interest of C.D.M.*, 888 S.W.2d 725, 728 (Mo.App. E.D. 1994). Point denied.

The judgment is affirmed.

DOWD, P.J., and REINHARD, J., concur.