In the Interest of C.M.K., C.L.K., and B.L.K. III, children under seventeen years of age.

E.G., Respondent–Appellant,

v.

State of Missouri, Greene County Juvenile Office, Petitioner–Respondent.

No. 25906.

Missouri Court of Appeals, Southern District, Division One.

June 25, 2004.

Application to Transfer Denied July 19, 2004.

Application for Transfer Denied Aug. 24, 2004.

John E. Kelly, Springfield, for appellant.

Bill Prince, Springfield, for respondent.

PHILLIP R. GARRISON, Judge.

Appellant, E.G. ("Mother"), the biological mother of C.M.K., C.L.K., and B.L.K., III (collectively referred to as "the children"), appeals the termination of her parental rights by the Juvenile Court of Greene County (the "Juvenile Court").[1] *See* Section 211.447.[2] On appeal, Mother argues that the Juvenile Court's ruling was against the weight of the evidence and, therefore, was in error. We affirm.

The record reveals that the children were placed in the temporary legal custody of the Missouri Division of Family Services ("DFS") on May 11, 2001, pursuant to an order of the Juvenile Court. The evidence established that the Greene County Juvenile Office ("Respondent") was prompted to take the children into protective custody following a report to the child abuse and neglect hotline.[3] Based on the hotline report, DFS intake officers, Dawn Stoll ("Stoll") and Emily Dortch ("Dortch"), went to the Executive Motor Inn, where the family had been living for several months, to investigate ongoing domestic violence between Mother and B.L.K., Jr. ("Father"). Stoll and Dortch were able to interview Mother, as well as speak to the children. Though Dortch classified the motel room as not "unsanitary," she noted that it was very small and that it was "[n]ext to impossible to breathe [in the room] due to the cigarette smoking."

When questioned, Mother denied that there had been a domestic violence situation between herself and Father; however, when the children were interviewed separately, they each described detailed instances of domestic violence between Mother and Father.

When Dortch attempted to refer Mother to the Family Violence Center, Mother refused their services and maintained that she was going to stay at the motel. Dortch testified that Mother was angry and hostile during their interview and did not seem to take into consideration the childrens' feelings about being taken into custody. Father, who hid in the bathroom during Dortch's visit, declined to speak to Dortch about the familial situation and Dortch's only contact with Father was when he shouted obscenities at her. Thereafter, Dortch recommended that the children be taken into protective custody.

On November 8, 2002, eighteen months after the children were initially placed in DFS custody, Respondent filed a petition to terminate the parental rights of Mother and Father. The petition was heard on August 13, 2003, at which time Mother appeared with counsel, but Father failed to defend his interests at the hearing or to respond to the petition in any manner.[4] Based upon the evidence before it, the Juvenile Court terminated the parental rights of both parents, enumerating several statutory grounds for its decision.

1. The record reveals that at the time of the hearing in this matter C.L.K. was eleven years old, C.M.K. was six years old, and B.L.K., III was seven years old.

2. Statutory references are to RSMo 2000, unless otherwise indicated.

3. An officer for DFS testified that the hotline report stemmed from an episode where "[t]wo of the kids had been at school and were upset and were crying, saying that they needed to go home and check on their mom, that their dad had hit their mom, and they were just inconsolable."

4. As Father does not appeal the Juvenile Court's decision, we will hereinafter only recount those findings and facts relevant to the termination of Mother's parental rights.

First, the Juvenile Court found that the children had been abused and/or neglected as delineated by Section 211.447.4(2).[5] Second, the Juvenile Court found that the children had been in its jurisdiction for more than one year, and that the conditions which initially resulted in assumption of jurisdiction continued to exist and were unlikely to be remedied in the near future.[6]

Third, the Juvenile Court found that Mother was unfit to be a party to the parent-child relationship due to a consistent pattern of committing domestic violence in the presence of the children and that, due to such violence, Mother was unable, for the reasonably foreseeable future, to care for the ongoing, physical, mental and emotional needs of the children.[7] The Juvenile

5. Section 211.447.4(2) provides in pertinent part:

(2) The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]

6. Section 211.447.4(3) provides that:

The juvenile officer or the division may file a petition to terminate the parental rights of the child's parent when it appears that[:]

. . . .

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

7. Section 211.447.4(6) provides:

(6) The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse, including but not limited to, abuses as defined in section 455.010, RSMo, child abuse or drug abuse before the child or of specific conditions directly relating to the

Court also considered and made required findings pursuant to Sections 211.447.4(2)(a-d) and 211.447.4(3)(a-d), in which it determined that while Mother did not suffer from chemical dependency or a mentally incapacitating condition, she had made little progress in complying with the terms of her social service plan and was unable to provide a proper home for the children.

In her sole point on appeal, Mother claims the Juvenile Court erred in terminating her parental rights because she "had done nothing to warrant the children's coming into alternative care and had substantially complied with her service agreement." She further argues that the Juvenile Court's determination that she had repeatedly neglected her children and failed to rectify the conditions which led to the assumption of jurisdiction by Respondent was against the weight of the evidence.

On appellate review, the judgment in a termination of parental rights case will be sustained "unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *In the Interest of F.M.*, 979 S.W.2d 944, 946 (Mo.App. S.D.1998). Substantial evidence means evidence which is "clear, cogent and convincing" or which "instantly tilts the scales in the affirmative when weighed against opposing evidence," leaving the fact-finder with "an abiding conviction that the evidence is true." *In re A.M.C.*, 983 S.W.2d 635, 637 (Mo.App. S.D.1999).

■ In order to terminate parental rights, there must first be clear and convincing evidence indicating that one or more grounds exist for termination under

parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable fu-

Section 211.447. *In the Interest of J.L.M.*, 64 S.W.3d 923, 924 (Mo.App. S.D.2002). In our review, we bear in mind that the Juvenile Court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. *In the Matter of M.M.*, 973 S.W.2d 165, 168 (Mo. App. S.D.1998). Further, when the Juvenile Court has received conflicting or contradictory evidence, we view the facts in the light most favorable to the Juvenile Court's judgment. *Id.*

■ In the matter at hand, Mother's claim of error appears to be directed at only two of the three grounds for termination found by the Juvenile Court. Neither Mother's point relied on, nor the argument following it, appears to challenge the sufficiency of the evidence to support the Juvenile Court's finding of parental unfitness under Section 211.447.4(6). Where, as here, multiple statutory grounds for termination of parental rights are cited, this court need only find that one of the statutory grounds was proven and that termination was in the best interest of the child. *See In re M.J.*, 66 S.W.3d 745, 747 (Mo.App. S.D.2001).

■ Even though Mother does not directly attack it on appeal, there was clear, cogent, and convincing evidence to support the Juvenile Court's findings under Section 211.447.4(6). Under this statute, the Juvenile Court found that Mother had engaged in a "consistent pattern of committing domestic violence before the children," which "directly relat[ed] to the parent and child relationship." Both prongs of Section 211.447.4(6) were accompanied by a finding that this pattern is "of

ture, to care appropriately for the ongoing physical, mental or emotional needs of the child.

a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child." *In the Interest of C.W.*, 64 S.W.3d 321, 324–325 (Mo.App. W.D.2001). Past abuse alone cannot be a basis for terminating parental rights under Section 211.447.4(6). *In the Interest of P.C.*, 62 S.W.3d 600, 606 (Mo.App. W.D.2001). The parent must be "currently unfit to be a party to the parent and child relationship." [8] *In the Interest of T.A.S.*, 32 S.W.3d 804, 814 (Mo.App. W.D.2000). The abuse must be of such a duration and nature that the Juvenile Court determines that the parent will not remedy the problem and so it renders the parent unfit for the reasonably foreseeable future. *In the Interest of P.C.*, 62 S.W.3d at 606.

In support of termination under this subdivision, the Juvenile Court said:

> The evidence presented established that the mother and the alleged biological father engaged in volatile domestic violence on a consistent basis before the minor children. The evidence indicated that the mother had dependent personality which could cause her on (sic) to rely on males. The mother and the alleged biological father have not demonstrated that their propensity for domestic violence now is any less than it was at the time the children were removed from the parental home. The children's relationship with the mother is such that after periods of visitation with the mother the children would act

out and have nightmares and night terrors, such that it was recommended that parent and child visits cease. The children have expressed significant fear of their father. Court finds that despite family and individual therapy these conditions in the parent-child relationship continue to exist and the court finds that there is no indication that these conditions will not continue for the foreseeable future.

Given the extensive findings by the Juvenile Court, this court finds Mother's contention that the judgment was against the weight of the evidence without merit.

Mother and Father have a history of domestic violence. C.L.K. told Stoll that his parents had been fighting the morning the children were taken into custody and that he witnessed Father hit Mother. C.L.K. also reported that Father had punched him in the stomach for not eating a bologna sandwich. In addition, all of the children eventually revealed that Father "had hit them." On at least one occasion since the children have been in alternative care, Mother was forced to call the police to remove Father from her presence. During a 2001 psychological evaluation performed by Dr. Mark Bradford ("Bradford"), Mother admitted that Father "had [ ] beaten and punched" her and had "slapped her" in front of the children. B.L.K. subsequently told Bradford that he had witnessed Mother punching Father on at least one occasion. In this matter, Mother and Father clearly engaged in a

---

**8.** All grounds for termination must to some extent look to past conduct, because the past provides vital clues to the present and future. *In the Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo.App. W.D.1996). Further, there must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm. *In the Interest of L.G.*, 764 S.W.2d 89, 95 (Mo. banc 1989). *See also In the Interest of M.E.W.*, 729 S.W.2d 194, 196

(Mo. banc 1987) (court needs to consider existing conditions, which may have arisen or were discovered after it assumed jurisdiction); *In the Interest of C.L.W.*, 115 S.W.3d 354, 358 (Mo.App. S.D.2003) (court must look at totality of parent's conduct both prior to and after filing of termination petition); *In the Interest of S.H.*, 915 S.W.2d 399, 404–5 (Mo.App. W.D.1996) (past patterns provide vital clues to present and future conduct).

consistent pattern of domestic violence in the presence of the children.

Mother continues to associate with Father despite the fact that she has been warned of the effects on the children, and Mother even brought Father to visit the children on several occasions. Sundee Bumgarner ("Bumgarner"), the family's DFS caseworker from May of 2001 through December of 2001, testified that she had discussed with Mother the importance of distancing herself from Father in order to meet the DFS goal of reunifying the family. Bumgarner's concerns about Father were based on the fact that he was "very negative toward the children," "he picked on them, called them names, was not at all nurturing" and was generally uncooperative with DFS. Bumgarner further explained that it was after one of the visits by both Mother and Father that DFS workers first noticed that the children were having adverse reactions from interacting with their parents. Bumgarner testified that the children experienced "[n]ightmares, night tremors, night terrors, bed wetting, anger problems, [and] depression slightly before visits." As a result of the childrens' reactions, all further visitation with their parents was halted by DFS.

Mother remains unable to care appropriately for the ongoing physical, mental and emotional needs of the children. Bradford testified that although Mother was "always pleasant and always cooperative," he was concerned "that she was a little on the lower-functioning side" and suffered from "mild mental retardation." Mother reported to Bradford a history of possible sexual abuse and acknowledged that she dropped out of school at age sixteen. She admitted that there was domestic violence in her relationship with Father and understood

that her children had been taken away due to that violence, but Bradford felt that she failed to express a significant level of concern about the implications of the abuse. Bradford characterized Mother as having a "more childlike kind of thinking pattern, more immature." He also stated that her responses were slow and "kind of primitive, childlike, immature, [m]aybe a little impulsive in terms of anger ... [with] poor coping skills." Bradford testified that the fact that Mother is a "highly dependent woman" might affect her ability to parent. He explained that she may "have difficulty maintaining boundaries for the children," "may be prone to getting involved in bad relationships with men who might be physically violent with her," and she may make "choices which put the children at risk in terms of who she might have around." Bradford was optimistic that it was possible, though unlikely, that with services and counseling or the involvement of a more mature person, Mother "might make a good auxiliary parent." Bradford stated that the vast majority of the time he had difficulty "recommending anybody who is mildly retarded caring for children."

Don McFall ("McFall") of Ozarks Psychological Associates testified that in his counseling with Mother they focused on issues of self-esteem, domestic violence, and parenting.[9] McFall's concern was that the children would "model the behavior" exhibited by their parents and would grow-up "somewhat scared" and fearful. He stated that it was his belief that Mother "has the tools to help her identify when domestic violence may be occurring and that she can walk away from it," and that she has made substantial steps in their counseling; however, he was unwilling to make a conclusion regarding Mother's ability to parent the children.

**9.** Mother attended twenty-three counseling sessions with McFall at Ozark Psychological Associates between January of 2001 and July of 2003.

As for the children, Bradford performed psychological evaluations on them as well. Bradford stated that C.M.K., who was four years old at the time of the evaluation, had seen a lot of conflict and "[h]is projective stories were of grown-ups fighting." C.M.K. had witnessed aggression from adults in an inconsistent and unpredictable environment and needed to be safe and secure in a stable home. B.L.K. revealed to Bradford that "he wanted to live with his mother," and that his Father "was mean. He bites on my mom, he punched my mom in the face." In recounting one occasion, B.L.K. stated that his mom punched him and "[m]e and mom run over there. We punched, and Mom punched Dad." Bradford highlighted that B.L.K. needs therapy to improve his ability to verbalize his feelings, as well as be in a secure home environment.

Further, the children in this situation have special needs of their own that will necessitate a great deal of parental involvement and support in the future. Henson testified that one of the children is on special medication for hyperactivity, one of the children is on anti-depressant medication, and that two of the children are in special education classes at school. Additionally, all three children remain in counseling and will continue to be in therapy for the foreseeable future. Bradford stated that the children's special needs make him less optimistic about Mother's ability to successfully parent the children on a long-term basis.

Mother has also failed to provide a stable home environment for the children. Bumgarner stated that she believed Moth-

er resided primarily with her own mother, J.G., but Bumgarner often had difficulties contacting Mother at that location and was often told that Mother had not been seen in several days. Additionally, Bumgarner expressed some concern about the children living with their grandmother, because J.G.'s own children, including Mother, had been removed from her custody on a previous occasion. When Mother disagreed with J.G., she would often move in with Father, a friend, or her sister, who had also lost custody of her children. When questioned by Kevin Henson, ("Henson"), the family's DFS caseworker from January 2002 until the time of trial, Mother usually indicated that she was "working on [getting her own place]," but ultimately never followed through on her efforts.

Bumgarner stated that despite the fact that she and Mother had gone over the terms of Mother's DFS treatment plan on numerous occasions, Mother failed to substantially comply with its terms and failed to accept guidance offered by DFS. For instance, Mother has failed to complete family counseling with Dr. Rosemary Barke; has failed to complete individual counseling with Steve Johnson at Ozarks Counseling Center; has failed to complete counseling with McFall at Ozarks Psychological; has failed to submit to a substance abuse assessment; has failed to complete the Parenting Life Skills program; and, has failed to provide regular in-kind support for the children with the exception of birthday gifts.[10]

While we commend Mother for her efforts, a parent must make a commitment to change the course of conduct which

10. We acknowledge that Mother has cooperated with certain provisions of her treatment plan: she has maintained regular visitation with the children; she has maintained employment; she has generally cooperated with DFS; she has signed all forms requested by DFS; she has participated in the "Hit No More" program; and, she has not violated any laws. We should also note that though Mother has maintained employment, she has had numerous jobs and has failed to retain a single job for longer than several weeks at a time.

necessitated the removal of the children. *See In the Interest of R.H.S.*, 737 S.W.2d 227, 236 (Mo.App. W.D.1987). Although the record does not contain any information that the children were physically abused by Mother, Mother was well-aware that the children's exposure to domestic violence was not healthy and she was advised on numerous occasions to distance herself from Father's abuse.[11] Yet, she continually failed to take action to protect the children or to illustrate her commitment to making changes to her lifestyle. Based on the foregoing, the provisions of Section 211.447.4(6) were supported by sufficient evidence. Though we need not address the Juvenile Court's other grounds for terminating Mother's parental rights, we do find that under the facts outlined above, the trial court's findings under Section 211.447.4(2) and Section 211.447.4(3) were similarly supported by clear, cogent, and convincing evidence. *See In re M.N.M.*, 906 S.W.2d 876, 879 (Mo.App. S.D.1995). Mother's point is, therefore, denied.

The judgment terminating Mother's parental rights is affirmed.

BARNEY, P.J., and PREWITT, J., concur.

---

**11.** It is not determinative that Father was the primary aggressor in the instances of domestic violence detailed above, because based on the totality of Mother's past conduct and behavior, the evidence is sufficient to support the Juvenile Court's finding under Section 211.447.4(6). Our courts have consistently found that, in situations where the non-abusive parent has had their rights terminated, it is enough that they knew or should have known about the abuse by the other parent, but failed to take corrective action. *See In re E.D.M.*, 126 S.W.3d 488, 496 (Mo.App. W.D.2004)(holding that termination of fa-

ther's rights was proper where he knew of mother's drug use, failed to be concerned about it, and failed to take steps to remove the children from her influence); *In the Interest of M.H.*, 859 S.W.2d 888, 895 (Mo.App. S.D. 1993) (holding that termination of father's parental rights was in error where there was no showing that father knew or should have known of the acts of abuse committed by mother); *In the Interest of N.D.*, 857 S.W.2d 835, 840 (Mo.App. W.D.1993) (termination of parental rights was proper where mother knew of father's sexual abuse of the children and failed to prevent further abuse).